

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE MAY 2 2 2014

Madsen, C.J.
CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on May 22, 2014

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| JAMES KUMAR, RANVEER SINGH, ASEGEDEW GEFE, ABBAS KOSYMOV, individuals, on behalf of themselves and all others similarly situated,<br><br>Appellants,<br><br>v.<br><br>GATE GOURMET, INC., a Delaware Corporation,<br><br>Respondent. | NO. 88062-0<br><br>EN BANC<br><br>Filed   MAY 2 2 2014 |

GORDON McCLOUD, J.—Appellants James Kumar, Ranveer Singh, Asegedew Gefe, and Abbas Kosymov brought a class action lawsuit against their employer, Gate Gourmet Inc., alleging two common law torts and two violations of Washington's Law Against Discrimination (the WLAD), chapter 49.60 RCW. The lawsuit stems from Gate Gourmet's employee meal policy, which bars employees from bringing in their own food for lunch (for security reasons), leaving only employer-provided food for the employees to eat. According to the plaintiffs, the

policy forces them to work without food or eat food that violates their religious beliefs. The trial court dismissed the lawsuit in its entirety, finding that the WLAD contains no requirement that employers make reasonable accommodations for their employees' religious practices. We granted direct review and now reverse.

FACTS[1]

The plaintiffs in this action (the employees) work near SeaTac airport for the defendant, Gate Gourmet, preparing meals for service on trains and airplanes. Due to security concerns, the employees can neither bring food with them to work nor leave the premises to obtain food during their 30-minute lunch break. Instead, Gate Gourmet provides meals for employees to consume during their break. These meals ostensibly consist of one vegetarian and one meat-based main dish. The employees allege, however, that Gate Gourmet uses animal by-products in the "vegetarian" option. Clerk's Papers (CP) at 14. They also allege that they informed Gate Gourmet that their various religious beliefs prohibited them from eating the beef-pork meatballs the company served, that Gate Gourmet responded by temporarily switching to turkey meatballs, that the company later switched back to the beef-pork

---

[1]The trial court dismissed for failure to state a claim. For purposes of this analysis, therefore, we assume the truth of the plaintiffs' allegations. *Cutler v. Phillips Petroleum Co.*, 124 Wn.2d 749, 755, 881 P.2d 216 (1994) (when reviewing a trial court's dismissal for failure to state a claim, the appellate court presumes the truth of the plaintiff's allegations).

mixture without notifying the employees, and that it now refuses to alter the employee meals. Finally, the complaint alleges harm. It claims that the employees "caused the plaintiffs . . . harm by deliberately refusing to accommodate their religious and moral beliefs." *Id.* In particular, the complaint alleges that Gate Gourmet's alleged deception caused "putative class members [to] unknowingly eat[ ] food forbidden by their beliefs," CP at 19, and that class members "have faced the choice of eating food forbidden by their sincerely held beliefs or not eating, have suffered offensive touching due to their contact with food prohibited by their beliefs, and have suffered distress as a result." CP at 22.

The employees brought a class action lawsuit alleging that Gate Gourmet's knowing refusal to label and "adapt[ ] its menu to accommodate the tenets of [their] beliefs and religions" violated the WLAD. CP at 21. This allegation is based on two distinct theories: (1) that Gate Gourmet's meal policy constituted a failure to reasonably accommodate the employees' religious practices and (2) that the meal policy has a disparate impact on employees who adhere to certain religions. The employees' complaint also states claims for the common law torts of battery and negligent infliction of emotional distress.[2]

---

[2]It does not state any claims under Title VII of the Civil Rights Act of 1964 but reserves the employees' right to do so in the future. Pub. L. 88-352, 78 Stat. 241, 255 (1964); 42 U.S.C. § 2000e-2(a).

The trial court granted in full Gate Gourmet's CR 12(b)(6) motion to dismiss the complaint. CP at 118-20. It concluded that under *Short v. Battle Ground School District*, 169 Wn. App. 188, 279 P.3d 902 (2012), the WLAD provides no cause of action for failure to reasonably accommodate religious practices. CP at 119. The order of dismissal contains no discussion of the disparate impact, battery, or negligence claims; in fact, the CR 12(b)(6) motion contains no discussion of the disparate impact claim. *Id.* The employees sought and obtained direct review by this court.

## ANALYSIS

### STANDARD OF REVIEW

All of the issues presented in this case are reviewed de novo.[3] "Under CR 12(b)(6) a plaintiff states a claim upon which relief can be granted if it is *possible* that facts could be established" that would support relief. *McCurry v. Chevy Chase Bank, FSB*, 169 Wn.2d 96, 101, 23 P.3d 861 (2010).

> *1. Does the WLAD require covered employers to make reasonable accommodations for their employees' religious practices?*
>
> > a. The WLAD creates a private cause of action for employment discrimination on the basis of religion

---

[3]*McKee v. AT&T Corp.*, 164 Wn.2d 372, 387, 191 P.3d 845 (2008) (legal conclusions are reviewed de novo); *Kinney v. Cook*, 159 Wn.2d 837, 842, 154 P.3d 206 (2001) (trial court's ruling to dismiss a claim under CR 12(b)(6) is reviewed de novo (citing *Tenore v. AT&T Wireless Servs.*, 136 Wn.2d 322, 329-30, 962 P.2d 104 (1998))).

As originally enacted in 1949, the WLAD prohibited employers from discriminating on the basis of "race, creed, color, or national origin." LAWS OF 1949, ch. 183, § 7. Today, it prohibits discrimination on the basis of those traits as well as "sex, marital status, sexual orientation . . . honorably discharged veteran or military status, or the presence of any sensory, mental or physical disability or the use of a trained dog guide or service animal by a person with a disability." RCW 49.60.180(1). Washington courts have long equated the term "creed" in the WLAD with the term "religion" in Title VII of the Civil Rights Act of 1964 (Title VII).[4] The parties agree that the term "creed" in the WLAD refers to religious belief.

Since its enactment, the WLAD has been administered by the Washington Human Rights Commission (HRC). The HRC has the power to "adopt, amend, and rescind suitable rules to carry out [its] provisions . . . and the policies and practices of the commission in connection therewith." RCW 49.60.120(3). In 1973, the WLAD was amended to create a private cause of action against any employer engaging in an *"unfair practice." Griffin v. Eller*, 130 Wn.2d 58, 63, 922 P.2d 788 (1996); *id.* at 78 & n.3 (Talmadge, J., dissenting). RCW 49.60.180(3) now provides

---

[4]*See Hiatt v. Walker Chevrolet Co.*, 120 Wn.2d 57, 61-62, 837 P.2d 618 (1992) (stating that "Title VII of the Civil Rights Act of 1964 is the federal counterpart to our state law" and referring to "federal and state law against *religious* discrimination") (emphasis added). *Accord Riste v. E. Wash. Bible Camp, Inc.*, 25 Wn. App. 299, 302, 605 P.2d 1294 (1980) (finding the term "creed," as used in the WLAD, to mean "a system of religious beliefs").

in relevant part that it is an "unfair practice" for an employer "[t]o discriminate against any person in compensation or in other terms or conditions of employment because of age, sex, marital status, sexual orientation, race, creed, color [or] national origin . . . ." The employees brought their class action suit under this provision.

b. Washington courts look to federal antidiscrimination law to help them construe the WLAD's provisions

In the employment context, the WLAD has three federal counterparts: Title VII, the Age Discrimination in Employment Act (ADEA),[5] and the Americans with Disabilities Act (ADA).[6] Title VII has prohibited employment discrimination on the basis of "race, color, religion, sex, or national origin, [etc.]" since 1964,[7] the ADEA has prohibited discrimination against older workers since 1967, and the ADA has prohibited employment discrimination on the basis of disability since 1990. The WLAD's employment provisions were amended in 1961 to prohibit age

---

[5]Age Discrimination in Employment Act of 1967, Pub. L. 90-202, 81 Stat. 602, 603 (1967); 29 U.S.C. § 623(a).

[6]American with Disabilities Act of 1990, Pub. L. 101-336, 104 Stat. 327, 331 (1990); 42 U.S.C. § 12111(a). Before Congress passed the ADA, Section 504 of the Rehabilitation Act of 1973 prohibited discrimination on the basis of disability in "any program or activity receiving federal financial assistance." Pub. L. 93-112, 87 Stat. 357 (1973). The WLAD's prohibitions on disability discrimination predate the Rehabilitation Act by several months.

[7]42 U.S.C. § 2000e-2(a).

discrimination,[8] in 1971 to prohibit sex discrimination,[9] and in 1973 to prohibit discrimination on the basis of marital status[10] and disability.[11] Thus, in every category but sex-based discrimination, our state WLAD's prohibitions predate their federal counterparts.[12]

Even though almost all of the WLAD's prohibitions predate Title VII's, the ADA's, and the ADEA's, Washington courts still look to federal case law interpreting those statutes to guide our interpretation of the WLAD.[13] Federal cases

---

[8]LAWS OF 1961, ch. 100, § 1.

[9]LAWS OF 1971, 1st Ex. Sess., ch. 81, § 3.

[10]LAWS OF 1973, ch. 141, § 10.

[11]LAWS OF 1973, 1st Ex. Sess., ch. 214, § 6.

[12]Note, however, that Title VII afforded employees a private cause of action for discrimination nine years earlier than the WLAD did, and the ADEA five years earlier. 42 U.S.C. § 2000e-2(a) (creating private cause of action for violation of Title VII); LAWS OF 1973, ch. 141, § 3 (creating private cause of action for violation of the WLAD); 29 U.S.C. § 623(a) (creating private cause of action for violation of ADEA).

[13]*Robel v. Roundup Corp.*, 148 Wn.2d 35, 44-45, 59 P.3d 611 (2002) (looking to federal cases interpreting Title VII and the ADA to determine whether the WLAD supports a disability claim based on a hostile work environment); *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 361-62, 753 P.2d 517 (1988) (looking to federal cases interpreting the ADEA to determine criteria for establishing an age discrimination claim under the WLAD); *Fahn v. Cowlitz County*, 93 Wn.2d 368, 376-82, 610 P.2d 857, 621 P.2d 1293 (1980) (looking to federal case law interpreting Title VII to determine the extent of the Human Rights Commission's authority to prohibit a facially neutral hiring policy with disparate impact on women and applicants of certain national origins).

are not binding on this court, which is "free to adopt those theories and rationale which best further the purposes and mandates of our state statute." *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 361-62, 753 P.2d 517 (1988). Where this court has departed from federal antidiscrimination statute precedent, however, it has almost always ruled that the WLAD provides greater employee protections than its federal counterparts do.[14]

    c. In *Short*, the Court of Appeals concluded that Washington's WLAD provides fewer protections against religious discrimination than Title VII does

While Title VII has explicitly required employers to make "reasonable accommodations" for employees' religious practices since 1972,[15] the WLAD lacks

---

[14]*See Brown v. Scott Paper Worldwide Co.*, 143 Wn.2d 349, 359, 20 P.3d 921 (2001) (noting that the WLAD covers a broader range of employers than does Title VII); *Martini v. Boeing Co.*, 137 Wn.2d 357, 372-73, 971 P.2d 45 (1999) (noting that the WLAD's express liberal interpretation mandate and greater damages provisions distinguish it from Title VII); *Marquis v. City of Spokane*, 130 Wn.2d 97, 110-11, 922 P.2d 43 (1996) (finding that the WLAD creates a cause of action for discrimination against independent contractors on the basis of sex, race, national origin, religion, or disability, partly on the basis that the WLAD prohibits discrimination in a broader range of contexts than does Title VII). *But see Dailey v. N. Coast Life Ins. Co.*, 129 Wn.2d 572, 575-76, 919 P.2d 589 (1996) (finding that the WLAD does not incorporate ostensible amendments to Title VII authorizing punitive damages, partly on the basis that Washington courts require express statutory authorization for exemplary damages).

[15]Pub. L. 92-261, 86 Stat. 103 (1972). This requirement appears in Title VII's definition of "religion," which has read as follows since the 1972 amendment:

    The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's

such an express requirement. In *Hiatt v. Walker Chevrolet Co.*, this court noted that difference and "specifically disapprove[d]" a Court of Appeals opinion that "assume[d]" the WLAD provided the same protections against religious discrimination that Title VII provides. 120 Wn.2d 57, 64, 837 P.2d 618 (1992).

But the *Hiatt* court expressly declined to decide whether the WLAD requires employers to reasonably accommodate their employees' religious practices, because doing so was not necessary to resolve the case before it. *Id. Hiatt* only provided an overview of that "important issue." *Id.* It noted that the issue had arisen in several other jurisdictions in which state antidiscrimination statutes analogous to the WLAD's *prohibited* religious discrimination but did not affirmatively *require* accommodations. *Id.* at 63. The *Hiatt* court found these jurisdictions evenly split: in three, courts had found a reasonable-accommodation-for-religion requirement implicit in their state's antidiscrimination statutes but in three others courts had found no such implicit requirement.[16] Ultimately, the *Hiatt* court concluded only that "[s]trong arguments can be presented on both sides of the issue." *Id.*

---

religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j).

[16]120 Wn.2d at 63 n.6 (citing *King v. Iowa Civil Rights Commission*, 334 N.W.2d 598, 601-02 (Iowa 1983), *Rankins v. Commission on Professional Competence*, 24 Cal. 3d 167, 171-74, 593 P.2d 852, 154 Cal. Rptr. 907 (1979), and *Wondzell v. Alaska Wood*

In *Short*, 169 Wn. App. 188, the case on which the trial court below relied when it dismissed the employees' claims, Division Two of the Court of Appeals answered the question that *Hiatt* left open. It held that the WLAD does not require employers to make reasonable accommodations for their employees' religious practices. *Id.* at 202. The *Short* court based this conclusion primarily on three factors: (1) the absence of an express reasonable-accommodation-for-religion requirement in the WLAD, (2) the fact that the WLAD's prohibition on religious employment discrimination predates Title VII's by 15 years, and (3) the HRC's failure to promulgate any rules containing such a requirement. *Id.* at 202-03.

d. We disapprove the *Short* court's analysis

The first factor the *Short* court cited—the WLAD's lack of an express reasonable accommodation mandate—is not persuasive. As discussed in detail in part (e) below, courts interpreting such silence in religious antidiscrimination law as endorsing rather than barring this particular antidiscrimination theory have the more persuasive argument.

---

*Products, Inc.*, 583 P.2d 860, 863 (Alaska 1978) as examples of cases finding an implicit reasonable accommodation requirement, and *American Motors Corp. v. Department of Industry, Labor & Human Relations*, 101 Wis.2d 337, 345-50, 305 N.W.2d 62 (1981), *Olin Corp. v. Illinois Fair Employment Practices Commission*, 34 Ill. App. 3d 868, 876, 341 N.E.2d 459 (1976), *aff'd*, 67 Ill. 2d 466, 367 N.E.2d 1267, 10 Ill. Dec. 501 (1977), and *Corey v. Avco-Lycoming Division, Avco Corp.*, 163 Conn. 309, 322-23, 307 A.2d 155 (1972) as examples of cases finding no such requirement).

The second factor upon which the *Short* court relied—the WLAD's enactment 15 years before Title VII—is not persuasive because we have never considered chronology when looking to federal case law to help interpret the WLAD. Rather, we have relied on federal civil rights jurisprudence where doing so "further[s] the purposes and mandates of [the WLAD]." *Grimwood*, 110 Wn.2d at 362. This court has therefore consulted federal case law in the contexts of age,[17] race,[18] and disability[19] discrimination even though the WLAD's provisions on age, race, and disability were enacted well before their federal counterparts. Thus, the fact that the WLAD's provisions on "creed" predate Title VII does not preclude this court's reliance on federal law to interpret those provisions.

The third factor upon which the *Short* court relied—the HRC's failure to promulgate rules requiring employers to reasonably accommodate employees' religious practices—is not persuasive because the agency's silence does not constitute an interpretation of the WLAD. It is certainly true that an administrative

---

[17]*Allison v. Hous. Auth.*, 118 Wn.2d 79, 821 P.2d 34 (1991) (looking to ADEA to determine criteria for establishing an age discrimination case under the WLAD).

[18]*Oliver v. Pac. Nw. Bell Tel. Co.*, 106 Wn.2d 675, 678, 724 P.2d 1003 (1986) (stating, in racial discrimination case, that "decisions interpreting [Title VII] are persuasive authority for the construction of [the WLAD]").

[19]*Robel*, 148 Wn.2d at 43 ("[t]o determine whether the [WLAD] supports a disability claim based on a hostile work environment, we may look to federal cases construing analogous federal statutes" such as the ADA (citing *Fahn*, 93 Wn.2d at 376)).

agency's silence must be deemed significant where it admits of only one reasonable interpretation.[20] Here, however, the HRC's silence regarding an employer's duty to accommodate religious practices is subject to more than one reasonable interpretation. It might indicate that the agency believes the WLAD imposes no such duty. But it might also indicate the opposite—that the agency assumes the WLAD imposes exactly the same duty to accommodate religious practices that Title VII does and thus needs no regulatory clarification. Indeed, the HRC's amicus brief in this case says exactly that; the HRC explains that it "has not doubted that the [WLAD] includes a religious accommodation requirement, and thus did not deem a rule on the subject necessary." Br. of Amicus Curiae HRC at 15.[21]

Moreover, just as an agency cannot promulgate a rule that exceeds its statutory mandate,[22] neither can it diminish statutory protections by failing to act. Gate Gourmet makes much of the fact that the HRC has promulgated rules requiring

---

[20]*See S. Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 345, 102 S. Ct. 1815, 72 L. Ed. 2d 114 (1982) (where agency historically engaged in comprehensive regulation of certain industry practices, the agency's silence regarding an affirmative defense based on a violation of those regulations was deemed significant).

[21]The HRC also explains that although it has not promulgated a rule expressly requiring employers to accommodate their employees' religious practices, it has recognized and enforced that requirement through interpretive guides and complaint investigations. Br. of Amicus Curiae HRC at 7-8.

[22]*Ass'n of Wash. Bus. v. Dep't of Revenue*, 155 Wn.2d 430, 437, 120 P.3d 46 (2005).

employers to reasonably accommodate employees with disabilities, arguing that the

HRC would have issued an identical rule mandating religious accommodations if it

believed the WLAD required them. But the HRC's rules did not create the

reasonable accommodation requirement for disability—they merely implemented a

requirement already inherent in the WLAD itself. *See Holland v. Boeing Co.*, 90

Wn.2d 384, 388-89, 583 P.2d 621 (1978) (finding a reasonable-accommodation-for-

disability requirement inherent in the "legislative policy" embodied in the WLAD,

even though that statute did not employ the term "accommodation").[23] Even if the

HRC had failed to promulgate any rules requiring reasonable accommodations for

employee disabilities, this court would still have been required to recognize that

---

[23]The dissent's conclusion that *Holland* "relied on an existing administrative regulation" is not accurate. Dissent at 4. While the *Holland* court cited the existence of implementing regulations as support for its conclusion that the WLAD requires affirmative accommodations for employees with disabilities, those regulations were not essential to the court's holding. *See Holland v. Boeing Co.*, 90 Wn.2d 384, 388-89, 583 P.2d 621 (1978) (internal citations omitted) ("[The WLAD] contains a strong statement of legislative policy. When, in 1973, the legislature chose to make this policy applicable to discrimination against the handicapped, we believe it is clear it mandated positive steps be taken. An interpretation to the contrary would not work to eliminate discrimination. It would instead maintain the status quo."(citing RCW 49.60.010, .030)). The dissent also errs in implying that *Holland* "distinguished between religious and disability discrimination" when it recognized an implied cause of action for failure to accommodate disability. Dissent at 4. The *Holland* court did not distinguish between religious and disability discrimination for purposes of the implied cause of action. Rather, it drew that distinction when rejecting the defendant employer's suggestion that the court import into the disability discrimination context the "de minimus effort test" applied by the United States Supreme Court in its seminal Title VII religious discrimination case. *Holland*, 90 Wn.2d at 390. See discussion of *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S. Ct. 2264, 53 L. Ed. 2d 113 (1977), *infra*, pp. 15-16.

implicit requirement in the WLAD's provisions. *See Am. Cont'l Ins. Co. v. Steen*, 151 Wn.2d 512, 518, 91 P.3d 864 (2004) (in interpreting a statute, the court's "primary objective is to ascertain and give effect to the [legislature's] intent and purpose" (citing *State v. Watson*, 146 Wn.2d 947, 954, 51 P.3d 66 (2002))).

So, with or without recourse to implementing rules, this court must interpret RCW 49.60.180 so as to give effect to the legislature's intent. In this case, that means choosing between two competing interpretations of the statute: the interpretation that says it implies a reasonable-accommodation-for-religion requirement and the interpretation that says it lacks such a requirement.

> e. Under state rules of statutory interpretation and persuasive federal antidiscrimination case law, the WLAD implies a requirement to reasonably accommodate religious practices

For help interpreting the WLAD, we look to cases applying Title VII's prohibition against religious discrimination. See *supra* notes 13 and 17-19 and accompanying text. Gate Gourmet argues that Title VII is more protective of employees' religious practices than is the WLAD, because Title VII was amended in 1972 to *expressly* require reasonable accommodations for religion. The employees counter that Title VII had always imposed a reasonable accommodation duty on the employer and that the 1972 amendment clarified (rather than expanded)

that implicit duty. The employees therefore conclude that the WLAD imposes the same implicit duty to reasonably accommodate employees' religious practices.

We agree with the employees. To explain why this is so, we provide a brief history of the reasonable accommodation requirement, followed by an overview of state and federal disparate impact jurisprudence.

Shortly after Title VII was enacted in 1964, the Equal Employment Opportunity Commission (EEOC) promulgated a rule interpreting the statute to require employers to reasonably accommodate employees' religious practices. 29 C.F.R. § 1605.1 (1967). At that point, Title VII prohibited religious discrimination but contained no language addressing reasonable accommodations one way or the other. 42 U.S.C. §2000e-2(a).

Initially the EEOC rule explicitly excluded work schedule alterations from the category of "reasonable accommodations," meaning that an employee could not demand time off to observe a holy day under that rule. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 85, 97 S. Ct. 2264, 53 L. Ed. 2d 113 (1977) (Marshall, J., dissenting) (quoting 29 C.F.R. § 1605.1(a)(3), (b)(3)). In 1967, however, the agency omitted the language exempting scheduling accommodations and replaced it with language requiring any accommodation that did not impose an "'undue hardship'" on the employer. *Id.* at 85-86 (quoting 29 C.F.R. § 1605.1(b)).

As this court noted in *Hiatt*, Congress amended Title VII in 1972 to expressly affirm the EEOC's reasonable accommodation rule. *Hiatt*, 120 Wn.2d at 62-63 & n.5 (citing 42 U.S.C. § 2000e(j); *Trans World Airlines*, 432 U.S. at 73). The 1972 amendment required employers to "reasonably accommodate to an employee's or prospective employee's religious observance or practice" to the extent possible "without undue hardship on the conduct of the employer's business." Pub. L. 92-261, 86 Stat. 103.

Only a few Court of Appeals cases have addressed the nature of the 1972 amendment. In *Dewey v. Reynolds Metals Co.*, 429 F.2d 324, 334 (6th Cir. 1970), *aff'd by an equally divided court*, 402 U.S. 689, 91 S. Ct. 2186, 29 L. Ed. 2d 267 (1971), a preamendment case, the Sixth Circuit decided that the EEOC had exceeded its statutory mandate by promulgating the reasonable accommodation requirement because it was "not consistent" with the preamendment statute's "plain language."[24]

---

[24]In addition to concluding that the reasonable accommodation requirement was "not consistent" with Title VII's "plain language," the *Dewey* majority rejected the requirement on constitutional avoidance grounds, worrying that it might be employed to "coerce or compel an employer to accede to [the] religious beliefs of all of his employees" and concluding that it therefore raised "grave constitutional questions" under the establishment clause of the First Amendment to the United States Constitution. *Dewey*, 429 F.2d at 334-35. The majority also rejected the requirement on policy grounds, predicting that employers would be "harassed by the filing of many of such claims" if the court were to "equate religious discrimination with failure to accommodate." *Id* at 335.

By contrast, more recent Fifth and Ninth Circuit cases have treated the 1972 amendment as clarifying rather than modifying Title VII's original meaning.[25]

We find that the Fifth and Ninth Circuits' reasoning is more consistent with the goals and prior controlling interpretations of the federal anti-discrimination law—particularly the United States Supreme Court's decision interpreting Title VII as barring not just employment practices based on discriminatory intent but also employment practices that produce "disparate impacts." This is critical, because our court has held that our Washington's LAD has those same goals and recognizes that same "disparate impact" cause of action.

The United States Supreme Court came to that conclusion first, in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971). In that case, the Supreme Court held that Title VII prohibits employment practices that are discriminatory in *effect* as well as those based on discriminatory *intent*. *Id.* at 429-30. The unanimous *Griggs* Court reasoned that Title VII's purposes could not be achieved unless the statute was construed to bar "practices . . . neutral on their face, and even neutral in terms of intent [that] operate to 'freeze' the status quo of prior discriminatory employment practices." *Id.* at 430. The Supreme Court therefore

---

[25]*See, e.g., Yott v. N. Am. Rockwell Corp.*, 501 F.2d 398, 402-03 (1974) ("Th[e] subsequent congressional affirmation strengthens our conclusion about the validity of the [EEOC's 1967] regulation."), *aff'd*, 602 F.2d 904 (9th Cir. 1979); *Riley v. Bendix Corp.*, 464 F.2d 1113 (5th Cir. 1972).

held that Title VII barred even a facially neutral job requirement if that requirement disproportionately burdened a protected class, unless the requirement bore a legitimate relation to "job performance," that is, unless it constituted a "business necessity." *Id.* at 431. The *Griggs* decision created the cause of action now known as a "disparate impact" claim. *Smith v. City of Jackson*, 544 U.S. 228, 230, 125 S. Ct. 1536, 161 L. Ed. 2d 410 (2005).

This court adopted *Griggs'* reasoning in *Fahn v. Cowlitz County*, 93 Wn.2d 368, 375-77, 610 P.2d 857, 621 P.2d 1293 (1980). In *Fahn*, we held that the HRC had authority to restrict preemployment inquiries regarding height and weight because they have a disparate impact on women and applicants of certain national origins. *Id.* The *Fahn* court cited *Griggs* for the principle that Title VII must be construed broadly and noted that "our legislature has likewise mandated a liberal construction for [the WLAD]." *Id.* at 376. We therefore embraced *Griggs'* logic and held that the WLAD empowered the HRC to promulgate rules implementing the "disparate impact" doctrine. *Id.* at 381. Under Washington law, as under federal law, the employer can defeat the plaintiff's prima facie "disparate impact" claim by showing that the challenged employment practice serves a "business necessity." *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 354-55, 172 P.3d 688 (2007).

Griggs and *Fahn* weigh heavily in our decision today. Both the "disparate impact" and "religious accommodation" doctrines bar facially neutral employment policies that have disproportionate adverse effects on a protected class. For this reason, courts in several other jurisdictions have concluded that recognizing an implied disparate impact claim goes hand in hand with recognizing an implied religious accommodation claim in statutes that prohibit religious discrimination. *Me. Human Rights Comm'n v. Local 1361, United Paperworker Int'l Union AFL-CIO*, 383 A.2d 369, 375-78 (Me. 1978); *Yott v. N. Am. Rockwell Corp.*, 501 F.2d 398, 402-03 (1974), *aff'd*, 602 F.2d 904 (9th Cir. 1979); *Reid v. Memphis Publ'g Co.*, 468 F.2d 346, 350 (1972), *aff'd in relevant part*, 521 F.2d 512, 520-21 (6th Cir. 1975); *Montgomery v. Bd. of Educ.*, 188 Or. App. 63, 68-69, 71 P.3d 94 (2003); *see also Rankins v. Comm'n on Prof'l Competence*, 24 Cal. 3d 167, 172-74, 593 P.2d 852, 154 Cal. Rptr. 907 (1979) (noting reasoning in federal courts).

We agree. Disparate impact and reasonable accommodation claims both prevent employers from adopting facially neutral policies that create or perpetuate discriminatory effects. There is no logical reason to recognize in the WLAD an implied prohibition on facially neutral policies that have disparate impacts but not

an implied requirement to reasonably accommodate religious practices, thereby avoiding such disparate impacts.[26]

Washington courts construe the WLAD's protections broadly where other forms of discrimination are concerned;[27] we decline to carve out an exception for religious discrimination. Accordingly, we hold that the WLAD creates a cause of action for failure to reasonably accommodate an employee's religious practices.[28]

---

[26]Instead of relying on *Fahn*, 93 Wn.2d 368, the dissent would rely on *Hegwine*, 162 Wn.2d at 349-52; dissent at 4, but *Hegwine* is inapposite. *Hegwine* rejected the employer's argument that a pregnancy discrimination claim should be viewed as a disability discrimination claim and analyzed under the "reasonable accommodation" standard. 162 Wn.2d at 352. Instead, the *Hegwine* court applied a sex-discrimination analysis, since "neither pregnancy nor pregnancy related medical conditions are disabilities under Washington law." *Id.* This holding was not a general indictment of implied causes of action. Rather, it was a straightforward application of the HRC's interpretive guidelines, which "plainly provide that claims of employment discrimination because of pregnancy are to be analyzed as matters of sex [as opposed to disability] discrimination." *Id.* at 349-50 ("While the plain language of [the WLAD] prohibits job discrimination 'because of . . . sex . . .' and does not specifically mention pregnancy, the [ ]HRC has enacted several interpretive regulations that clarify discrimination because of pregnancy is sex discrimination." (second and third alterations in original)). Indeed, the question presented in *Hegwine* had nothing to do with implied causes of action. No one argued that the plaintiff had no cause of action in *Hegwine*—rather, the parties argued over how that cause of action should be categorized (as sex discrimination or as disability discrimination). *Id.* at 348-50. Thus, the dissent errs by asserting that "*Hegwine* is our most recent and relevant case addressing whether to imply a failure to accommodate cause of action into the WLAD." Dissent at 5. *Hegwine* is simply not on point.

[27]*See, e.g., Martini*, 137 Wn.2d at 372-73; *Fahn*, 93 Wn.2d at 376-82.

[28]The dissent cites RCW 49.60.040(11), which exempts religious nonprofits from liability for employment discrimination under the WLAD, as evidence that "the legislature has given due consideration to the complexities and implications of legislating in the religious discrimination arena and has chosen not to do so." Dissent at 2. We respectfully

2. *Have the employees stated a claim for failure to reasonably accommodate religious practices?*

The United States Supreme Court has never listed the elements of a prima facie claim for failure to accommodate religious practices.[29] Several Courts of Appeals, however, have adopted a test based on the "disparate impact" burden-shifting scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See, e.g.*, *Equal Emp't Opportunity Comm'n v. Abercrombie & Fitch Stores, Inc.*, 731 F.3d 1106, 1122 (10th Cir. 2013); *Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1293 (11th Cir. 2012); *Equal Emp't Opportunity Comm'n v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008); *Berry v. Dep't of Soc. Serv.*, 447 F.3d 642, 655 (9th Cir. 2006).

Under this test, a plaintiff establishes a prima facie claim of failure to accommodate religious practices by showing that (1) he or she had a bona fide religious belief, the practice of which conflicted with employment duties; (2) he or

---

disagree. While the legislature has chosen to exempt religious nonprofits from liability for discrimination under the WLAD, it has *not* exempted private non-religious-employers like the defendant in this case. The dissent therefore errs in citing RCW 49.60.040(11) as proof that the legislature does not want non-religious-employers to be liable for discrimination.

[29]Its most recent relevant case declines to reach that question. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 67, 107 S. Ct. 367, 93 L. Ed. 2d 305 (1986) (declining the petitioner's invitation to "delineat[e] the plaintiff's prima facie case").

she informed the employer of the beliefs and the conflict; and (3) the employer responded by subjecting the employee to threatened or actual discriminatory treatment. *Porter v. City of Chicago*, 700 F.3d 944 (7th Cir. 2012); *Lawson v. Wash.*, 296 F.3d 799, 804 (9th Cir. 2002).[30]

To be sure, the employer can defend by showing that it offered the employee a reasonable accommodation or that an accommodation would be an "undue hardship" on the employer. *Abercrombie*, 731 F.3d at 1122-23; *Berry*, 447 F.3d at 655. Congress did not define the term "undue hardship" when it enacted the 1972 amendment, but the United States Supreme Court has ruled that an "undue hardship" results whenever an accommodation "require[s an employer] to bear more than a *de minimis* cost." *Trans World Airlines*, 432 U.S. at 84 (decided in posttrial context, not at pleading stage). The United States Supreme Court has also ruled that a "reasonable accommodation" need not be the precise accommodation the employee requests, even if the employer could provide that accommodation without suffering any undue hardship. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68, 107 S. Ct. 367,

---

[30]An employee need not be at immediate risk of actual firing or demotion to demonstrate threatened or actual discriminatory treatment. *See, e.g., Berry*, 447 F.3d at 655 (employee established an "'adverse employment action'" for purposes of prima facie religious accommodation claim where employer "'formally instruct[ed] him not to pray with or proselytize to clients'"); *Equal Emp't Opportunity Comm'n v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 614 n.5 (9th Cir. 1988) ("An employee does not cease to be discriminated against because he temporarily gives up his religious practice and submits to the employment policy.").

93 L. Ed. 2d 305 (1986). And other courts have held that an undue hardship may be something other than a financial burden. An employer can defeat a religious accommodation claim by showing that valid concerns other than money—e.g., legal obligations[31] or the interests of clients[32] or other employees[33]—would be unduly burdened by an accommodation.

But the complaint need only allege the elements of a prima facie case. Under the test for a prima facie case, described above, the employees here have stated a claim for failure to reasonably accommodate their religious practices. Their complaint alleges that (1) they hold sincere religious beliefs, CP at 17-18, which conflict with Gate Gourmet's requirement that all employees eat company-provided food, CP at 16-17; (2) they informed Gate Gourmet of the conflict, CP at 19; and (3)

---

[31]*Berry*, 447 F.3d at 655 (risk to public employer of violating the establishment clause is an undue hardship).

[32]*E.g., Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 161 (2d Cir. 2001) (Title VII did not require employer to permit nurse to proselytize while providing services).

[33]*E.g., Harrell v. Donahue*, 638 F.3d 975, 981 & n.7 (8th Cir. 2011) (accommodation was unreasonable where it would have required other employees to work weekend shifts that they otherwise would have been exempt from under the seniority system); *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 608 (9th Cir. 2004) (undue hardships results where accommodation would "allow[] actions that demean or degrade, or are designed to demean or degrade, members of [employer's] workforce"); *Wilson v. U.S. W. Commc'ns*, 58 F.3d 1337, 1339-42 (8th Cir. 1995) (employee not entitled to display religiously motivated image that upset and offended fellow employees to the point of disrupting productivity).

Gate Gourmet responded by first deceiving the employees into eating food prohibited by their religions, *id.*, and then by refusing to entertain any of the employees' proposed accommodations, with the result that the employees were forced to eat prohibited food or work hungry, CP at 19-20. The employees have met their burden to establish a prima facie religious accommodation claim. *Berry*, 447 F.3d at 655; *Lawson*, 296 F.3d at 804. We reverse the trial court's order dismissing the employees' claim of failure to reasonably accommodate their religious practices.

*3. Have the employees stated a claim for disparate impact?*

As discussed above, this court has held that the WLAD creates a cause of action for disparate impact. *E-Z Loader Boat Trailers, Inc. v. Travelers Indem. Co.*, 106 Wn.2d 901, 909, 726 P.2d 439 (1986). To establish a prima facie case of disparate impact, the plaintiff must show that (1) a facially neutral employment practice (2) falls more harshly on a protected class. *Oliver v. Pac. Nw. Bell Tel. Co.*, 106 Wn.2d 675, 679 & n.1, 724 P.2d 1003 (1986) (citing *Shannon v. Pay'N Save Corp.*, 104 Wn.2d 722, 727, 709 P.2d 799 (1985)).

The employees' complaint alleges that Gate Gourmet maintains a facially neutral employee meal policy that falls more harshly on those within a protected class. The trial court's order dismissing this claim is therefore reversed.

*4. Have the employees stated a claim for battery?*

A "battery" is an intentional and unpermitted contact with the plaintiff's person. A defendant is liable for battery if (a) "he [or she] acts intending to cause a harmful or offensive contact with the [plaintiff or a third party], or an imminent apprehension of such contact, and (b) a harmful or offensive contact with the [plaintiff] directly or indirectly results." RESTATEMENT (SECOND) OF TORTS § 13 (1965). "A bodily contact is offensive if it offends a reasonable sense of personal dignity." RESTATEMENT (SECOND) OF TORTS § 19. Thus, an offensive contact does not have to result in physical injury to constitute a battery. *See Seigel v. Long*, 169 Ala. 79, 53 So. 753 (1910) (facts established claim for battery where defendant pushed plaintiff's hat back in order to see his face); *Crawford v. Bergen*, 91 Iowa 675, 60 N.W. 205 (1894) (facts established claim for battery where defendant placed his hand on the plaintiff's shoulder and asked him an insulting question).

Gate Gourmet asserts that the employees have failed to allege an "'intentional infliction of a harmful bodily contact upon another,'" because they have failed to allege "contact," "force," and "intent." Respt's Br. at 29-31 (quoting *Garratt v. Dailey*, 46 Wn.2d 197, 200, 279 P.2d 1091 (1955)).

We disagree. First, the "contact" element of a battery is simply a harmful or an offensive contact with the plaintiff; thus, a battery can occur where, for example, the plaintiff comes in harmful contact with the ground but never touches the

defendant. *See Garratt*, 46 Wn.2d 197 at 200-01. Second, "force" is not an element of battery. *Id.* Finally, the "intent" element of battery is satisfied where a defendant knows to a "substantial certainty" that his actions will result in the harmful or offensive touching. *Id.* at 202. A person therefore commits a battery where he or she performs "'[a]n act which, directly or indirectly, is the legal cause of a harmful contact with another's person'" and that act is intentional, is not consented to, and is otherwise unprivileged. *Id.* at 200 (quoting RESTATEMENT OF TORTS § 13 (1934)). These elements are met where the plaintiff's consent to the contact "'is procured by fraud or duress.'" *Id.* at 201 (quoting RESTATEMENT OF TORTS § 13(b)).

The employees allege that Gate Gourmet deceived them into eating food in violation of their religious beliefs, knowing that this would cause an offensive contact. These allegations are sufficient to support a claim for battery at this stage. The trial court's order dismissing this claim is therefore reversed.

> 5. *Have the employees have stated a claim for negligent infliction of emotional distress?*

A plaintiff may recover for negligent infliction of emotional distress if she proves duty, breach, proximate cause, damage, and "objective symptomatology." *Strong v. Terrell*, 147 Wn. App. 376, 387, 195 P.3d 977 (2008) (citing *Kloepfel v. Bokor*, 149 Wn.2d 192, 198, 66 P.3d 630 (2003)). This court has recognized that actions based on mental distress must be subject to limitation by the courts, and it

has concluded that the proper limitation is a balance of risk against utility. *See Snyder v. Med. Serv. Corp. of E. Wash.*, 145 Wn.2d 233, 244, 35 P.3d 1158 (2001). Accordingly, in the negligent infliction of emotional distress context, we have held that an employer's conduct is unreasonable when its risk outweighs its utility. *Id.* The employees allege that Gate Gourmet knowingly implemented a meal policy that posed a risk to the employees' religious well-being, and that this risk far outweighed the policy's utility to the company. It is "*possible* that facts could be established" to support the employees' allegations that Gate Gourmet breached a duty to the employees and that this breach resulted in emotional harm. *McCurry*, 169 Wn.2d at 101. To maintain an action for negligent infliction of emotional distress, however, a plaintiff must also establish "emotional distress . . . susceptible to medical diagnosis and proved through medical evidence." *Hegel v. McMahon*, 136 Wn.2d 122, 135, 960 P.2d 424 (1998). The employees here have not identified what, if any, specific objective symptomatology their harm entailed, stating that they will be able to ascertain "relevant facts" only when discovery begins. CP at 37.

That is a possibility. This case was dismissed at the pleading stage, and the employees' claim for negligent infliction of emotional distress was dismissed

without analysis. In light of this fact and in light of Washington's relatively liberal standard for stating a cognizable claim,[34] we reverse the dismissal.

## CONCLUSION

The WLAD includes a duty to reasonably accommodate an employee's religious practices. The trial court thus erred when it dismissed the employees' reasonable accommodation claim on the ground that the WLAD created no cause of action for failure to accommodate religious practices. The trial court also erred in dismissing the employees' claims for disparate impact, battery, and negligent infliction of emotional distress. We reverse the decision of the Superior Court and remand for further proceedings consistent with this opinion.

---

[34]*See McCurry*, 169 Wn.2d at 101-03 (rejecting the more stringent federal standard for stating a claim).

_Gordon McCloud, J._

WE CONCUR:

_Wiggins, J._

_Stephens, J._

_González, J._

_Fairhurst, J._

No. 88062-0

MADSEN, C.J. (dissenting)—I believe that the majority erred by implying a cause

of action for religious accommodation into the Washington Law Against Discrimination

(WLAD), chapter 49.60 RCW, in the absence of any legislative or administrative

directive. Notwithstanding this error, the majority then misapplies this newly created

accommodation cause of action to this case. Even assuming a new cause of action,

Kumar fails to allege a requisite adverse employment action and therefore fails to state a

prima facie case. I respectfully dissent.

## Discussion

To begin with, the majority's decision to imply an accommodation cause of action

encroaches on the exclusive law making function of the legislature and in so doing

disrupts the delicate balance between the branches of government mandated by the

Washington Constitution. Neither the legislature nor any administrative agency has

spoken on the issue of religious accommodation, and "[i]t is not the role of the judiciary

1

No. 88062-0
Madsen, C.J. (dissenting)

to second-guess the wisdom" of this inaction. *Rousso v. State*, 170 Wn.2d 70, 75, 239 P.3d 1084 (2010).

It is important to remember that a cause of action for discrimination in private employment is based in statute. The legislature included religion as one of many grounds on which to establish a discrimination claim under RCW 49.60.180(1) and directed the Human Rights Commission (HRC) to promulgate rules to implement the purposes of the WLAD. RCW 49.60.110, .120. At the same time, the legislature chose to entirely exempt nonprofit religious institutions from prosecution under the WLAD. RCW 49.60.040(1).[1] The existence of this exemption is strong evidence that the legislature has given due consideration to the complexities and implications of legislating in the religious discrimination arena and has chosen not to do so, at least for the time being. This decision may reflect caution to regulate in this complex area, a desire to rely on the federal cause of action provided by Title VII of the Civil Rights Act of 1964 (Title VII),[2] a need for more time to fully vet the likely impact of creating an accommodation cause of action, or perhaps deference to the HRC through its rule making authority to do this vetting and to decide whether to engage in rule making. Whatever the reason, the legislature's decision not to act deserves respect.

The legislature has given authority to the HRC, not this court, to create specific rules to effect its general intent. RCW 49.60.110 ("The commission shall formulate

---

[1] We recently rejected a facial challenge to the constitutionality of this exemption in *Ockletree v. Franciscan Health System*, 179 Wn.2d 769, 317 P.3d 1009 (2014).

[2] Pub. L. 88-352, 78 Stat. 241 (1964); 42 U.S.C. § 2000e-2(a).

2

policies to effectuate the purposes of this chapter."), .120(3) (stating that the HRC has the power "[t]o adopt, amend, and rescind suitable rules to carry out the provisions of this chapter"). The HRC has exercised this authority, most notably when it promulgated rules requiring accommodation for persons with disabilities.

Rule making gives the public notice of proposed rules and an opportunity to comment thereon. Judicial law making of the type engaged in by the majority, alternately, gives no notice to parties and provides no opportunity for public input to help vet the consequences. Instead, the majority imposes a new cause of action and applies it to Gate Gourmet without any prior notice of how it might have conformed its behavior to the law. The HRC has so far declined to exercise their legislative grant of power and has neither recognized nor provided rules establishing an accommodation cause of action as it did in the context of disability discrimination. Agencies are experts in their fields and have the time, resources, and knowledge to make the most informed decisions. Additionally, rule making provides an important opportunity to those most affected to offer critical input. This court should not announce new regulations where the HRC has chosen not to.

The majority justifies its decision to bypass the HRC by contending that HRC regulations merely interpret preexisting WLAD law rather than create new law. Majority at 13. The majority cites *Holland v. Boeing Co.*, 90 Wn.2d 384, 583 P.2d 621 (1978), for this proposition, reasoning that in *Holland* the court found an accommodation action in the disability context "inherent" in the WLAD itself. Majority at 13. Though this court

in *Holland* did recognize the compatibility of a disability accommodation claim with the governing policy of WLAD, this court nowhere said such a disability cause of action was "inherent" and preexisting in the WLAD. *Holland*, 90 Wn.2d at 388-89. In fact, *Holland* gave "great weight" to an existing administrative regulation that had created an accommodation cause of action for disability discrimination. *Id.* at 389 ("The regulation, as the construction of the statute by those whose duty it is to administer its terms, is entitled to be given great weight."). Moreover, *Holland* emphasized the unique difficulties faced by handicapped individuals in the workplace and even explicitly distinguished between religious and disability discrimination. *Id.* at 388 (explaining that, in contrast to other forms of discrimination, "different treatment may eliminate discrimination against the handicapped and open the door to employment opportunities"). Because Congress had also recognized the exceptional challenges faced by disabled employees by providing a cause of action separate from Title VII, this court declined to use the Title VII standard for measuring an unfair employment practice in the employment context. *Id.* at 390 ("Congress recognized, as do we, that discrimination on the basis of handicap is different in many respects from other types of employment discrimination."). Though collateral to the court's decision to imply a cause of action for accommodation of disability, the distinction shows the court's recognition of disability discrimination and religious discrimination as two different bodies of law. The majority's reliance on *Holland* is misplaced.

4

Instead, this court should heed the teaching of *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 349-52, 172 P.3d 688 (2007), where we declined to imply an accommodation claim for sex discrimination. In *Hegwine* a woman challenged an employer's refusal to hire her because she was pregnant, reasoning that the employer was liable for sex discrimination under the WLAD. *Id.* at 345-48. We noted the legislature's silence and reasoned that "[i]t is not for this court to impose such an accommodation analysis where the legislature has not seen fit to do so." *Id.* at 352. The majority contends that *Hegwine* is "inapposite" based on a "straightforward application of the HRC's interpretive guidelines." Majority at 20 n.26. Though the *Hegwine* court did use HRC guidelines to determine that pregnancy fell within the realm of sex rather than disability discrimination, the court went on to hold that the failure to accommodate is not actionable as sex discrimination and declined to imply a cause of action. Whether or not the parties focused on this point is irrelevant; this court reached the issue and chose not to imply an accommodation action. *Hegwine* is our most recent and relevant case addressing whether to imply a failure to accommodate cause of action into the WLAD, and its reasoning is on point here.

I also disagree with the majority's analogy to disparate impact claims as support for implying an accommodation cause of action. The majority reasons that because we have implied a disparate impact cause of action into the WLAD, we can imply a similar religious accommodation cause of action. Majority at 17-20. Contrary to the majority's contention, I do find a "logical reason" to recognize disparate impact but not

5

accommodation claims in the WLAD. *Id.* at 20. Unlike religious accommodation, disparate impact is not a "cause of action" but is merely an alternate method of proving discrimination under RCW 49.60.180(1). An employee can prove discrimination by showing actual discriminatory intent or by showing a disparate impact in the absence of intent. A typical discrimination claim, whether proven through treatment or impact, promotes access to employment opportunities for all. Accommodation claims require that the employer not just refrain from discrimination in hiring, firing, and promotion decisions but rather reasonably accommodate employees' demands for alterations in employment conditions when grounded in bona fide religious belief. The majority cites *Fahn v. Cowlitz County*, 93 Wn.2d 368, 378, 610 P.2d 857 (1980), to support its proposition that disparate impact is its own cause of action, yet *Fawn* itself refers to disparate impact and disparate treatment as two "forms" of discrimination. Our disparate impact jurisprudence provides no support for implying an accommodation cause of action into the WLAD.

Furthermore, though the majority is correct that federal Title VII jurisprudence is relevant to the interpretation of the WLAD, the United States Supreme Court's decision to recognize a religious accommodation cause of action was motivated by a very different history than its recognition of disparate impact methods of proof. In 1972, Congress created a cause of action for religious accommodation by amending the definition of "religion" in Title VII. 42 U.S.C. § 2000e(j). The majority credits the employees' argument that "Title VII had always imposed a reasonable accommodation duty on the

6

employer and that the 1972 amendment clarified (rather than expanded) that implicit duty . . . to reasonably accommodate employees' religious practices." Majority at 15. The majority contends that the WLAD must likewise contain an implicit religious accommodation cause of action. But the majority overlooks a crucial fact. Shortly after Congress enacted Title VII, the Equal Employment Opportunity Commission (EEOC) promulgated a rule establishing a religious accommodation cause of action. The EEOC promulgated this rule using their legislatively granted rule making authority to apply the legislative intent of Title VII. So although the Court did recognize an accommodation cause of action before Congress explicitly amended Title VII in 1972, this long standing recognition was supported by a rule crafted by an agency that Congress had granted specific authority to interpret and apply the statute at issue. As addressed above, the HRC, though cloaked with the same authority as the EEOC, never promulgated a rule establishing a religious accommodation cause of action. Unlike the United States Supreme Court, this court has no support, legislative or administrative, for finding an implicit religious accommodation action in the WLAD.

Even if I agreed with the majority's decision to imply an accommodation cause of action, I strongly disagree with its application of such a cause of action to these facts. By creating a new accommodation cause of action without any legislative or administrative guidance, this court's only choice is to create a cause of action identical to the federal Title VII accommodation claim. The majority holds that our new accommodation claim will track the federal equivalent but misapplies the prima facie elements. Federal law

7

requires the existence of a cognizable employment harm to sustain a valid accommodation claim. To state a prima facie case of failure to accommodate under Title VII, the employee must show (1) the employee holds a bona fide religious belief, (2) the employee informed the employer of that belief, and (3) the employee was *disciplined* for failing to comply with the conflicting employer policy. 2 CHARLES A. SULLIVAN ET AL., EMPLOYMENT DISCRIMINATION: LAW AND PRACTICE 551 (3d ed. 2002). Indeed, this court in *Hiatt v. Walker Chevrolet Co.*, 120 Wn.2d 57, 64-65, 837 P.2d 618 (1992), required *actual discharge* of the employee in order to satisfy the third prong of a prima facie Title VII accommodation claim.

Kumar fails to allege discharge or discipline. The Gate Gourmet employees may have held bona fide religious beliefs and did notify their employer of those beliefs, but they did not suffer any sort of punishment, reprimand, threat of punishment, or discharge based on these beliefs. The prima facie requirement of an adverse employment action serves an important purpose in accommodation claims. Private employers are under no *constitutional* duty to accommodate the religious beliefs of employees and the requirement of an adverse employment consequence properly limits the statutory accommodation remedy to the most serious cases of employer discrimination.

Though some cases suggest that actual discharge is not always required, even those cases recognize that there must at the very least be an "implicit threat" of adverse employment consequences or the existence of constructive discharge. *E.g., Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 655 (9th Cir. 2006) (stating that the prima facie

8

elements may be met by showing an implicit threat of adverse employment action);

*Equal Emp't Opportunity Comm'n v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610 (9th Cir. 1988) (addressing constructive discharge in the context of a religious accommodation claim). In a footnote, the majority contends that an "employee need not be at immediate risk of actual firing or demotion to demonstrate threatened or actual discriminatory treatment." Majority at 22 n.30. Even following the cases the majority cites, the facts here do not support an adequate prima facie case.

For example in *Berry*, 447 F.3d at 655, cited by the majority, the court held that the third prong of the accommodation cause of action was satisfied because "'the employer, at least implicitly, threatened some adverse action by formally instructing [the employee] not to pray or proselytize to clients.'" *Kumar* does not come close to showing an "implicit threat" because the petitioners were never reprimanded, threatened, or "instructed." There is no evidence that the *Kumar* employees would have faced any adverse employment action.

The majority also quotes *Townley* for the proposition that "[a]n employee does not cease to be discriminated against because he temporarily gives up his religious practice and submits to the employment policy." 859 F.2d at 614 n.5; Majority at 22 n.30. Though an accurate quotation, the majority overlooks the fact that *Townley* was a constructive discharge case where the employee was so offended by the employer's requirement to attend weekly religious services that he felt compelled to quit his job.

9

*Townley*, 859 F.2d at 612. The Gate Gourmet employees, in contrast, were not moved to quit. *Townley* does not support the majority's position.

In short, I disagree with the majority's decision to create out of whole cloth a new cause of action for failure to accommodate without any suggestion that the legislature or the HRC intended to provide such a claim. Moreover, Title VII requires some form of actual or threatened adverse employment action to meet the third prong of a prima facie accommodation claim. The majority is wrong to suggest otherwise. Under any reasonable definition of a prima facie case, Kumar failed to allege the requisite employment harm. Thus, even if this court implies an accommodation cause of action into the WLAD, Kumar cannot state a prima facie case.

I respectfully dissent.

No. 88062-0
Madsen, C.J. (dissenting)

Madsen, C.J.

11