IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ANGELA GERMAN,<br><br>                Appellant,<br><br>        v.<br><br>UNIVERSITY OF WASHINGTON, a<br>Washington state entity,<br><br>                Respondent. | No. 85038-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Angela German, a flight nurse based in Wenatchee, reported sexual harassment to her employer, Airlift Northwest (ALNW). Approximately nine months later, ALNW investigated a report of a safety incident involving German. Based on its investigation, ALNW counseled German regarding its expectations for flight nurses sitting next to pilots in communicating about potential safety issues and temporarily restricted her to fixed-wing aircraft, which required her to fly from a different base. German then sued the University of Washington, ALNW's parent, for sexual harassment and retaliation under the Washington Law Against Discrimination (WLAD). She voluntarily dismissed her harassment claim, and the trial court granted ALNW's motion for summary judgment dismissing her retaliation claim. We reverse the trial court because there is a genuine issue of fact as to whether German's sexual harassment complaint was a substantial factor motivating ALNW's adverse actions against her. We therefore remand to the trial court for further proceedings.

FACTS

The University of Washington Medical Center operates ALNW to provide air transport for critically ill and injured patients throughout the northwest United States. A typical flight crew consists of two flight nurses and one pilot. ALNW directly employs flight nurses but contracts with Air Methods to provide helicopters and pilots.[1] An ALNW base generally serves either helicopters or fixed-wing aircraft, not both.

Generally, nurses and pilots start and finish a 24-hour shift at an assigned primary base. But subject to a collective bargaining agreement, both nurses and pilots schedule themselves by bidding for different crews, aircraft types, and bases. For example, German began her ALNW career in 2015 at a base in Yakima, then moved to the Wenatchee base when it opened in 2019. This meant she reported for work in Yakima, flew to Wenatchee, and then returned to Yakima at the end of her shift.

On Monday, January 20, 2020, German disclosed to a fellow nurse that a pilot, Shawn Moore, sexually assaulted her. Her fellow nurse immediately informed Chief Flight Nurse Brenda Nelson. Nelson informed Moore's employer Air Methods that same day. The next day, German took part in a conference call with Nelson, ALNW human resources (HR) manager Kathy Schell, ALNW regional manager Jonas Landstrom, and the head of peer support at ALNW, Traci Pearl. At the end of the month, having not heard back regarding her

---

[1] Aero Air provides fixed-wing aircraft and pilots.

complaint, German asked Nelson whether she would have to work with Moore. Nelson told German that Moore had resigned from Air Methods.

Two days after German reported the assault, ALNW Wenatchee base manager Suzy Beck e-mailed regional manager Landstrom, Nelson, and HR manager Schell regarding concerns at the Wenatchee base and "an environment perpetuated of [sic] mistrust between peers primarily related to lack of effective communication and problem solving skills." Beck stated that "Angie German's name is the one that consistently comes up," explaining that "[t]here have now been three concerns that have been lodged against pilots for inappropriate behavior by this same person."[2] Beck expressed her "sincere concerns" for the safety and wellbeing of both German and the Wenatchee team, and asked that German be "temporarily reassigned" while "the process [took] place." She believed that, otherwise, the situation is "set up for disaster from a flight safety standpoint."

The following week, Beck again e-mailed regional manager Landstrom and Nelson to "update" them of "rumors floating around" that German was in a relationship with a former Air Methods employee, Kevin Eads. Beck noted that Eads left Air Methods in "a very unhappy and angry state," and that she was "[n]ot sure how much influence he has on her with the allegations made." On February 6, Beck e-mailed regional manager Landstrom, Nelson, and HR manager Schell yet again to offer a "synopsis of incidents [involving German] I am aware of and was present for." On February 11, Chief Flight Nurse Nelson e-

---

[2] Beck also noted that all of these concerns had been reported to Nelson and Landstrom for follow up, with both ALNW and Air Methods human resources involved.

mailed the Wenatchee base staff about an "open workplace investigation" and explained the complaint resolution policy. She described "the most recent workplace investigation" as "ongoing" and stated that, therefore, she was not able to share information about conclusions or outcomes.

In March, Beck e-mailed Landstrom, Schell, and Chief Flight Nurse Nelson about how to approach the issue of German and her fellow flight nurse Dawn Fritts "scheduling themselves together." According to Beck, staff had previously raised concerns "that there was more of a social focus to their shifts," which caused distraction and concern regarding "clinical aspects of care," and as a result, German and Fritts had "receive[d] verbal coaching" that they were not to schedule more than three shifts together. Nelson replied and asked "who are you actually concerned about—it is just Angie?" Beck responded, "It is Angie that I am most concerned about. . . . We have more men in our group now, and none of them (or their SO's) feel comfortable scheduling to work with [German] because they don't want to be her next accusation."

In July, Beck e-mailed Landstrom, Nelson, and interim ALNW executive director Jeff Richey, noting that the previous December and January she had contacted management about "the morale situation at the Wenatchee Base" and that she had agreed to stay on until after she had hand surgery "to see where things went since there was an investigation pending." Beck describes the past three weeks as "a pure breath of fresh air with Dawn and Angie gone" but that with their return, she felt a knot in her stomach return and her blood pressure rising. Beck reported that "more behaviors of flagrant disregard to following policy

and protocol have been documented," including "schedule bid manipulation," and she "continue[d] to hear from staff that they don't want to work with or be part of that pairing [of German and Fritts]........especially the male medical crew and pilots with Angie after the allegations she has made." Beck concluded, "I want to be transparent and forthcoming to let you know that my plan will be to step out as Base Manager as soon as [another position] becomes available." In an e-mail only to Schell regarding Beck's message, Chief Flight Nurse Nelson stated, "I don't really know what to do with this. I think we definitely need to finish the investigation on the issue with Angie."

On August 13, 2020, German was part of a flight crew that landed a helicopter at Toppenish, Washington. Chris McConnell was the pilot, German flew "front seat nurse," and Fritts was the back seat nurse. There is a tall flag pole at one end of the landing area, and a shorter light pole at the other end. ALNW always lands on the paved path between the two. As the helicopter was landing, German called out one of the poles and pilot McConnell confirmed it. But as McConnell allegedly later told Beck, German "did not state the clock position of the pole" she saw, and, after the helicopter landed without incident, McConnell "realized he had not seen the pole [German] was referring to."[3]

Fritts, who had been on the Toppenish flight, later testified that after the helicopter landed, McConnell said, "Oh, that pole. I didn't have that pole." According to Fritts, McConnell added, "Next time call it out by the clock." German

_____

[3] According to German, clock position is the proper technique "when calling out an object for a landing zone." She explained the technique is "where you identify an object by saying what position on the clock it is."

similarly testified at her deposition that she had called out a pole without stating the clock position, and after landing, the pilot realized "he had not seen the pole [she] was referring to even though [he] had . . . called out the pole that he saw." She confirmed she understood the need for the clock system, but "[w]hat I didn't understand is that it fell sole responsibility onto one flight nurse which was myself."

On August 31, Beck spoke with Landstrom about "events that were shared with me regarding Angela German and significant safety issues that have occurred recently…..one being a significant near miss." Following the call, in an e-mail to Landstrom, Chief Flight Nurse Nelson, ALNW safety officer David Manley, and Richey, Beck shared the contents of her conversation with pilot McConnell about the incident, including that "he does not trust her to be in the front seat" when he is pilot. She also shared concerns expressed by two other pilots about German's "lack of communication and her challenging of pilots while being in the front seat," and stated that "they are hesitant to have her in the front seat from a safety perspective." Finally, Beck requested "that the Toppenish event at minimum go through a detailed review as I believe this was a significant event as a 'near miss.' " Manley responded shortly after, agreeing that "an event review [wa]s warranted." He noted that while they should have pilots participate, they might be reluctant as they might "feel like they will be retaliated against," and "[t]he climate that has resulted from Angie's ability to work with others has now become a direct safety concern for the well-being of our teams."

On September 2, 2020, flight nurse and Wenatchee base safety representative Amy Nelson[4] wrote an e-mail to Richey, Chief Flight Nurse Nelson, David Manley, and regional manager Landstrom. She stated that three pilots had safety concerns about "one particular nurse," but the pilots feel they cannot talk, "debrief," or share their concerns due to "incessant flippant sarcastic responses and fear of retaliation." Amy Nelson related what she was told about the Toppenish flight, and she added that the same pilot asked her to "fly up front" so there would be "a reliable, eyes out, active participant" in the front seat. Without naming German, she reported that another pilot told her, "when you ask one particular nurse to look [if the runway is clear] they make snide comments about how no other pilot makes her look, also something along the lines of 'isn't that your job' and basically refuses to look." Amy Nelson concluded her e-mail by stating that she does not feel comfortable flying with the unnamed nurse, who said things like "I have done so much shit here and haven't gotten fired" and "I am only here for the paycheck and not to work." When she was deposed, Amy Nelson named the three pilots and identified German as the nurse. She also said that her fellow nurse, Jesse Hopson, asked her to write the e-mail after the two of them realized they were discussing a pattern and not single incidents. Beck testified that she had asked Amy Nelson to provide the statement.

Hopson wrote his own e-mail to Richey, Chief Flight Nurse Nelson, Manley, Landstrom, and Beck on the same day, September 2. Beck testified that she had asked Hopson to write the statement. He admitted to "some bias I have

---

[4] Because there are two Nelsons in this case, we refer to Brenda Nelson with her title, as Chief Flight Nurse Nelson, and we refer to Amy Nelson by her first and last name.

with the ALNW flight RN involved because of an ongoing HR investigation," and that he had "chosen not to fly with this RN due to this ongoing, unresolved investigation" and the "known friction she causes." He reported that three pilots "expressed concern" about flying with German but will not step forward for "fear of disrupting the customer/vendor relationship in addition to fear of experiencing retaliation as evidenced by [German]'s history of retaliation, . . . and reputation of 'removing' pilots she doesn't like." Hopson stated that all three pilots "would prefer if she just did not ride up front at all." He concluded that "it is clear that everyone on this team is at an aviation safety risk in the aircraft with [German] as she continues to behave in this manner."

ALNW asked Air Methods, which employed the pilots, to request the pilots to provide written statements regarding safety concerns. The pilot on the Toppenish flight, Chris McConnell, declined. Only one pilot, Jacob Leeper, wrote a statement. Leeper wrote on September 3 that he had interacted with German a "handful" of times. He wrote that the "real problem I have is I don't feel comfortable debriefing with her after a flight." He said that twice, in flight, he asked her to look out her window for air traffic and both times German responded that she had already seen the traffic and it was "no factor." Leeper explained that there was "ANOTHER aircraft" in that direction based on radio traffic, but German told him, "Like I already told you, I saw him and he[']s no factor." Leeper ended his e-mail by saying that "the frustration comes when I am unable to ask for assistance when it pertains to safety of flight."

On September 14, 2020, regional manager Landstrom held a Zoom[5] meeting with German, her union representative Lydia Kline, HR manager Schell, and Chief Flight Nurse Nelson about the Toppenish flight. According to Landstrom, in the Zoom meeting, when she was asked if she was willing to "take on the responsibility to assist the pilot . . . while sitting in the left seat up front," German "was saying: 'I do not have pilot eyes. I can't do that.' " Landstrom testified at his deposition that German also said if she saw a hazard she would call it out, but to him the concern was "that in one statement she says that, 'I don't have pilot eyes,' [but] the next five minutes later, she is saying that she would be willing to do so."

On September 20, 2020, Landstrom sent German a letter to schedule a "Formal Counseling Session" with her. That letter explained the reason for the counseling session was "[German] failed to communicate appropriately," "[she was] defensive and seemed unaware of the issue," and German was "unwilling[] to take on the responsibility to assist the pilot . . . while sitting in the left seat up front." Landstrom attached an "action plan" restricting German to fixed-wing aircraft and transferring her to ALNW's base at Boeing Field in Seattle. German understood she would be restricted to fixed-wing aircraft for a year and that there was no pay difference between flying on helicopters and fixed-wing aircraft. Nonetheless, as she lived in Ellensburg, the transfer to Boeing Field increased her commute time, required her to spend two nights away from her children rather than one per shift, and prevented her from working overtime.

---

[5] Zoom is a cloud-based videoconferencing software platform.

9

After the September 14 counseling meeting, Fritts e-mailed Chief Flight Nurse Nelson about the Toppenish flight. She relayed that German had "asked the pilot if he had the pole and he said that he did," but after they landed, the pilot commented that "he did not have the pole and was joking and laughing" while requesting that they use the clock to reference obstacles. Fritts testified later that no one in management had reached out to her about the Toppenish flight, German had not asked her to write the e-mail, and she was "shocked" nobody talked to her about "an incident that was supposed to be so terrible."

In October 2020, German started working at Boeing Field. She felt as if ALNW "set [her] up for failure" because "[i]t was all very, very vague" and she wasn't given things to work on. She was introduced to the team via e-mail as "just need[ing] support in a more mature environment to work with" and that she "wasn't coming on a disciplinary guideline." Nevertheless, German testified that she "made it through" and was never fired. When ALNW's base at Boeing Field was closed in 2021, German was assigned to Pasco, Washington, to fly in fixed-wing aircraft. In 2022, she joined the "West Side Float Pool" to work from ALNW bases west of the Cascade Mountains, but a shoulder injury kept her away from work. When she returned to work in August 2022, she was "reoriented" to helicopters. In October 2022, she bid for and was assigned to ALNW's helicopter base in Bremerton.

In July 2021, German sued ALNW's parent, the University of Washington, for sexual harassment and retaliation under WLAD. She subsequently voluntarily

dismissed her sexual harassment claims. After discovery, ALNW moved for summary judgment dismissing her remaining WLAD retaliation claim.

The court granted ALNW's motion, concluding that ALNW's "action and the nexus to the action is directly and reasonably related to the safety violations." Further, the court held that ALNW's actions were not adverse actions.

German timely appeals.

DISCUSSION

German challenges the summary judgment dismissal of her WLAD retaliation claim. Summary judgment is proper if the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). A material fact is one that affects the outcome of the litigation. Owen v. Burlington N. & Santa Fe R.R. Co., 153 Wn.2d 780, 789, 108 P.3d 1220 (2005). We review a grant of summary judgment de novo considering all the facts and reasonable inferences in the light most favorable to the nonmoving party. Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County, 189 Wn.2d 516, 526, 404 P.3d 464 (2017).

WLAD proscribes discrimination in employment on the basis of sex, among other bases. RCW 49.60.030. WLAD also prohibits employers from retaliating against employees who oppose discriminatory practices. RCW 49.60.210(1). To further these purposes, the legislature has directed us to liberally construe the provisions of WLAD. RCW 49.60.020; Cornwell v. Microsoft Corp., 192 Wn.2d 403, 411, 430 P.3d 229 (2018).

"[S]ummary judgment to an employer is seldom appropriate in the WLAD cases because of the difficulty of proving a discriminatory motivation." Scrivener, 181 Wn.2d at 445. " 'When the record contains reasonable but competing inferences of both discrimination and nondiscrimination, the trier of fact must determine the true motivation.' " Mikkelsen, 189 Wn.2d at 528 (quoting Scrivener, 181 Wn.2d at 445).

As direct evidence of discriminatory or retaliatory animus is rare, "we have repeatedly emphasized that plaintiffs may rely on circumstantial, indirect, and inferential evidence to establish [retaliatory] action." Mikkelsen, 189 Wn.2d at 526. "Because intentional discrimination is difficult to prove," id. at 526, Washington courts use the three-step McDonnell Douglas[6] burden-shifting framework "to determine the proper order and nature of proof for summary judgment." Scrivener v. Clark Coll., 181 Wn.2d 439, 445, 334 P.3d 541 (2014). First, to establish a prima facie case of retaliation, a plaintiff employee must show three things: (1) the employee took a statutorily protected action, (2) the employee suffered an adverse employment action, and (3) a causal link between the employee's protected activity and the adverse employment action. Cornwell, 192 Wn.2d at 411. Establishing a prima facie case creates a rebuttable presumption in a plaintiff's favor. Scrivener, 181 Wn.2d at 446.

At the second step of the McDonnell Douglas framework, the burden then shifts to the defendant employer to "articulate a legitimate, nondiscriminatory

_____

[6] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

reason for the adverse employment action." Scrivener, 181 Wn.2d at 446. This is a burden of production, not persuasion. Wilmot v. Kaiser Alum. & Chem. Corp., 118 Wn.2d 46, 70, 821 P.2d 18 (1991).

If the defendant meets this burden, to overcome summary judgment, the plaintiff must produce sufficient evidence showing that the defendant's alleged nondiscriminatory reason for the adverse employment action was a pretext. Mikkelsen, 186 Wn.2d at 527-28. An employee may create a genuine issue of material fact with evidence "(1) that the defendant's reason is pretextual or (2) that although the employer's stated reason is legitimate, [retaliation] nevertheless was a substantial factor motivating the employer." Scrivener, 181 Wn.2d at 446-47.

German argues summary judgment was improper for several reasons. She alleges the court erred by ruling as a matter of law that she was not subject to adverse action and that there was no causal connection between her protected activity and the actions taken against her. German also contends the court erred by "disregarding" evidence of pretext, by ruling as a matter of law that a fellow employee was not a proper comparator, and by "ignoring" evidence of subordinate bias that could be imputed to ALNW. Finally, she argues that there is sufficient evidence to establish a genuine issue of material fact as to whether retaliation was a substantial factor motivating the employer to take adverse action against her.

I.      Evidence of a Prima Facie Case

The parties do not dispute that German can establish the first element of her prima facie case for retaliation under WLAD. The record shows that in October 2020, German complained to Chief Nurse Nelson and others that ALNW employees "were retaliating against her" due to her allegation of sexual assault. However, the parties dispute the second and third elements of the prima facie case, whether she suffered an adverse employment action and whether there is a causal link between her protected activity and the adverse employment action.

The trial court decided ALNW's action was not adverse "in any way." We disagree. A plaintiff's burden at this point is one of production, not persuasion. Cornwell, 192 Wn.2d at 412 (citing Scrivener, 181 Wn.2d at 445). "The burden of establishing a prima facie case . . . is not onerous." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). " 'An employment action is adverse if it is harmful to the point that it would dissuade a reasonable employee from making complaints of sexual harassment or retaliation.' " Jin Zhu v. N. Cent. Educ. Serv. Dist.-ESD 171, 189 Wn.2d 607, 619, 404 P.3d 504 (2017) (quoting Boyd v. Dep't of Soc. & Health Servs., 187 Wn. App. 1, 15, 349 P.3d 864 (2015) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006))). Whether an action is adverse depends on the facts and circumstances of the particular case, and it is judged objectively, " 'from the perspective of a reasonable person in the plaintiff's position.' " Boyd, 187 Wn. App. at 13 (citing Tyner v. State, 137 Wn. App. 545, 565, 154 P.3d 920 (2007) (quoting Burlington, 548 U.S. at 69-70)).

Even if, as ALNW argues, the counseling memo carried no "negative consequences" to German's employment status or career, it would dissuade a reasonable employee in German's position from making complaints of sexual harassment or retaliation. Moreover, the action plan included a transfer to a different airfield and a restriction to work only on fixed-wing aircraft while remedially studying safety protocols. By restricting German to fixed-wing aircraft, ALNW limited the number of bases for which she could bid, increased her commute time, and limited the overtime hours for which she could bid. We conclude that these consequences of the counseling session memo and action plan satisfy German's burden at the prima facie stage to provide evidence of an adverse action.[7]

A plaintiff establishes the element of causation for a prima facie case by showing that retaliation was a substantial factor motivating the adverse action. Cornwell, 192 Wn.2d at 412. An employee may show this with evidence that (1) the employee took a protected action, (2) the employer had knowledge of the action, and (3) the employee was subjected to an adverse employment action. Id. at 413.

Here, the record shows that German reported sexual harassment to ALNW in January 2020, ALNW knew of this protected activity, and it took an adverse action against her after investigating the concerns raised about the

---

[7] German identifies two other possible adverse actions: ALNW's failure to investigate her retaliation claim and ALNW's refusal to accommodate her 2022 shoulder injury. Because we conclude that ALNW's actions relating to the investigation of the Toppenish flight are sufficient to establish an adverse action at the prima facie stage, we need not address the other claimed adverse actions. And German later appears to abandon these other claimed "adverse actions" as she attacks only ALNW's "reasons for German's discipline and transfer."

Toppenish flight. Therefore, German satisfied her initial burden to produce evidence establishing a causal connection between the harassment she reported and ALNW's adverse action.

II.      Evidence that Employer's Reason Was a Pretext or That Retaliation Was a Substantial Factor

Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. ALNW states that the reason for the counseling memo and action plan were that she failed to communicate properly, i.e., use the clock system, when communicating with a pilot, and that she has an "unwillingness to take on the responsibility to assist the pilot" when she is "sitting in the left seat up front." German does not dispute that ALNW met its burden of production at this second McDonnell Douglas step.

The third step of the McDonnell Douglas framework, however, is in dispute. At this step, "[a]n employee may satisfy the pretext prong by offering sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer." Scrivener, 181 Wn.2d at 446-47.

A.  Evidence that ALNW's Stated Reason Was Pretextual

"An employee does not need to disprove each of the employer's articulated reasons to satisfy the pretext burden of production." Id. at 447 (emphasis omitted). "This is because '[a]n employer may be motivated by multiple purposes, both legitimate and illegitimate, when making employment

16

decisions and still be liable.' " Mikkelsen, 189 Wn.2d at 534 (quoting Scrivener, 181 Wn.2d at 447). To establish pretext, "a plaintiff must show, *for example*, that [1] the reason has no basis in fact, [2] it was not really a motivating factor for the decision [or] [3] it lacks a temporal connection to the decision or [4] was not a motivating factor in employment decisions for other employees in the same circumstances." Scrivener, 181 Wn.2d at 447-48 (quoting Kuyper v. Dep't of Wildlife, 79 Wn. App. 732, 738–39, 904 P.2d 793 (1995) (emphasis added)). A plaintiff may satisfy the pretext prong in one of these four ways, but the plaintiff may also satisfy the pretext prong by presenting sufficient evidence that discrimination nevertheless was a substantial factor motivating the employer. Scrivener, 181 Wn.2d at 447.

German claims ALNW's articulated reason had no basis in fact, was not temporally connected to her adverse employment action, or was not a factor that motivated an adverse employment action regarding another flight nurse in the same circumstances as her. We address each in turn.

First, German argues that whether or not the flight to Toppenish was a "near miss" is a material fact about which there is a genuine dispute. Thus, she contends, there is no basis in fact for ALNW's stated reason for counseling German, that she failed to use the clock system when communicating with a pilot and was unwilling to accept the "front seat nurse" responsibility to help pilots.

Here, German herself testified that she "did not state the clock position of the pole." When asked during the investigation of that flight, German stated that she did not have "pilot eyes" so she could not assist pilots. Thus, even if, as

17

German contends, the Toppenish flight was not a "near miss," there is a basis in fact for ALNW's stated reasons for counseling German.[8]

Second, German argues that ALNW's reason for taking adverse action was a pretext because it relied on an e-mail from one of the pilots at Wenatchee, Jacob Leeper, that was temporally disconnected from the adverse action "because it contains no indication of when or where the incident occurred." German contends this is an example of "papering the file," which may be considered evidence of pretext. See Xiaoyan Tang v. Citizens Bank, N.A., 821 F.3d 206, 222 (1st Cir. 2016).

The parties do not dispute that Leeper's e-mail, dated September 3, identified safety and communications concerns that were the basis for ALNW counseling German. In the e-mail, Leeper states he "do[es no]t feel comfortable debriefing with her after a flight" and illustrates his concern with an example, but also specifically notes he is summarizing a "handful of situations" and a "few flights." While Leeper's e-mail does not provide dates, other than that he started with Air Methods in January, he identifies a pattern of behavior from several incidents that led to his concern about German's unwillingness to communicate with the pilot when she was in the front seat. Leeper's e-mail was one of several that raised concerns about German and flight safety. German offers no evidence that the situations and flights Leeper described were so out of date that they

---

[8] In her reply brief, German argues "ALNW cannot now say with straight face that it believed German was suddenly abdicating her duties as a flight nurse" because Chief Nurse Nelson answered "[y]es" when asked if, "presumably" German would call out a hazard on a runway. But this is precisely what ALNW stated it is concerned about. As Landstrom testified in his deposition, "that's what, really, [is] concerning us; is that in one statement she says that, 'I don't have pilot eyes,' [but] the next five minutes later, she is saying that she would be willing to do so."

were not connected to the counseling that occurred within two weeks of Leeper's e-mail, and the burden is hers at this stage of the burden-shifting framework.

Third, German also argues that ALNW's reason is pretextual because it failed to discipline a fellow employee in the same circumstances, Dawn Fritts. Whether a comparator is similarly situated to the plaintiff is usually a question of fact for the fact-finder. Coleman v. Donahoe, 667 F.3d 835, 847 (7th Cir. 2012). Generally, a plaintiff must at least show that a comparator (1) had the same supervisor, (2) was subject to the same standards; and (3) engaged in similar conduct without differentiating factors that would distinguish their conduct or the employer's treatment of them. Id.

ANLW's policy and procedure number 7113 distinguishes the responsibilities of staff other than the pilot in a rotary wing aircraft:

  i. On takeoff and landing staff should be looking outside the aircraft observing for other aircraft, obstructions, or wires and notify the pilot.

  j. One staff member will sit in front copilot seat on all non-patient legs to assist with safe flight operations including interfacing with the pilot and monitoring for other aircraft. This includes wearing NVGs [Night Vision Goggles] during night time operations.

German argues this policy does not require her to use the clock system and requires staff, "both the front and back flight nurses," to call out potential safety hazards. But her reading ignores the responsibility assigned specifically to the nurse sitting "in front copilot seat . . . to assist with safe flight operations including interfacing with the pilot." German herself explained the distinction between the "up-front flight nurse" and the "nurse in the back":

> So the up-front flight nurse is the one that is eyes out looking, they're watching for obstacles, they're watching for birds, other aircraft. They're kind of the second set of eyes for the pilot. And that allows the nurse in the back to be getting ready, writing up protocols, anything that she needs to be doing.

While Fritts also reported to Chief Nurse Nelson, on the Toppenish flight at issue, she was in the back seat. The record does not demonstrate that while serving as the front seat nurse, Fritts raised the same concerns as German did. Thus, German does not establish a question of fact as to whether she received different treatment than a comparator.

In sum, we conclude that the record evidence does not raise a genuine issue of material fact that ALNW's reasons for the action it took against German lacked a basis in fact, were not temporally connected to the adverse action, or that ALNW failed to take action against a comparator in the same circumstances.

### B. Evidence of Retaliation as a Substantial Factor

German may also satisfy the pretext prong by presenting sufficient evidence that retaliation nevertheless was a substantial factor motivating the employer. See Scrivener, 181 Wn.2d at 447. "To survive summary judgment, the employee needs only to present evidence sufficient to create a genuine issue of material fact whether '[retaliation] was *a* substantial factor in an adverse employment action, not the only motivating factor.' " Mikkelsen, 189 Wn.2d at 534 (quoting Scrivener, 181 Wn.2d at 447).

ALNW contends that "what, really, concern[ed]" Landstrom was safety. It argues that "[t]he relevant question is whether the alleged poor performance [i.e., German's lack of "pilot eyes,"] was the *actual reason* for the [adverse]

employment action – <u>not</u> whether the investigation reached a completely accurate conclusion." Brief of Respondent 54 (citing <u>Mackey v. Home Depot USA, Inc.</u>, 12 Wn. App. 2d 557, 582, 459 P.3d 371 (2020)). ALNW is partially correct, in that the ultimate accuracy of the investigation is not at issue. But German may still establish a triable issue of material fact by proffering evidence that her sexual harassment complaints "was *a* substantial factor in" ALNW's decision to counsel her. <u>See</u> <u>Mikkelsen</u>, 189 Wn.2d at 534.

German argues that even if safety was a factor, the trial court ignored direct evidence that Suzy Beck possessed a retaliatory animus towards her and influenced ALNW to discipline her. "[I]f a supervisor performs an act motivated by . . . animus that is intended by the [biased] supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." <u>Staub v. Proctor Hosp.</u>, 562 U.S. 411, 422, 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011) <u>quoted in</u> <u>Boyd</u>, 187 Wn. App. at 20. Again, "[u]nder Washington law, in order for the act to be a proximate cause, it must be a substantial factor" in the adverse action. <u>Boyd</u>, 187 Wn. App. at 20.

For example, in <u>Allison v. Housing Authority of City of Seattle</u>, evidence that a subsequent supervisor made a decision to lay off the plaintiff based on information from the prior supervisor, about whom there was evidence of discriminatory and retaliatory animus, was sufficient to establish a triable issue on plaintiff's retaliation claim. 118 Wn.2d 79, 821 P.2d 34 (1991). The year before the layoff, the plaintiff had filed an age discrimination suit after her

supervisor at the time, Ghan, asked her age, which was 62 at the time. Id. at 82. There was evidence that Allison was given an allegedly unwarranted reprimand and received her lowest performance evaluation after filing suit. Id. at 97. Later, in implementing a reduction in force, her new supervisor told Allison and her colleagues that he would base his decision about who to lay off based on their prior performance evaluations, evaluations Ghan had performed. Id. at 83. One of her colleagues was retained and another transferred; only Allison was laid off. Id. at 83. After deciding that the correct standard was whether retaliation was "a substantial factor motivating the adverse employment decision," the court determined that there was sufficient evidence for the case to go to a jury and remanded for retrial. Id. at 96, 98.

An independent investigation will not necessarily relieve an employer for an adverse action. Boyd, 187 Wn. App. at 18. "[I]f the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . , then the employer will not be liable." Staub, 562 U.S. at 421, quoted in Boyd, 187 Wn. App. at 18. "But if the independent investigation relies on facts provided by the biased supervisor . . . then the employer (either directly or through the ultimate decision-maker) will have effectively delegated the factfinding portion of the investigation to the biased supervisor." Staub, 562 U.S. at 421, quoted in Boyd, 187 Wn. App. at 18.[9] For example, in Boyd, in an

---

[9] The Ninth Circuit has described this concept: "We hold that if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process." Poland v. Chertoff, 494 F.3d 1174, 1182 (9th Cir. 2007). Washington

investigation of the plaintiff that led to discipline, a supervisor as to whom there was evidence of retaliatory animus collected witness statements and conducted some witness interviews for the employer's investigator. The employer's subsequent independent investigator then relied on that prior investigation. Division Two of this court held that a jury could find that the biased supervisor's animus was a proximate cause of the employer's adverse action.[10] Boyd, 187 Wn. App. at 18-19.

In this case, German argues that ALNW's decision-maker, regional manager Landstrom, was influenced by Beck because Landstrom testified that he took "into account" e-mails from Beck and others in deciding to counsel her. The record shows Beck complained repeatedly about German based on her complaints of sexual harassment. Beginning immediately after German first complained of sexual assault by a pilot, Beck contacted Landstrom, Chief Flight Nurse Nelson, and HR manager Schell regarding German's three complaints about pilots and requested that German be temporarily reassigned pending the investigation, and suggested her presence was "a set up for disaster from a flight safety standpoint." In the ensuing months, Beck continued to raise issues about German, sharing rumors about her relationships with pilots, complaining about German and Fritts manipulating schedule bids, and suggesting that pilots did not want to fly with German. In July, Beck again raised concerns about schedule bid

---

courts look to federal case law to guide their interpretation of the WLAD. Kumar v. Gate Gourmet, Inc., 180 Wn.2d 481, 491, 325 P.3d 193 (2014).

[10] The Boyd court was reviewing an order denying a CR 50 motion, under which it viewed the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party, the same as we do in reviewing a summary judgment dismissal.

manipulation and tied morale issues to pilots being concerned after German's allegations. Discussing Beck's July e-mail, Chief Nurse Nelson suggests, in her own e-mail to HR manager Schell, that ALNW still considered the investigation open: "I think we definitely need to finish the investigation on the issue with [German]." Thus, there is evidence that Beck's purported concerns about German were at least in part based on her complaints about sexual harassment because, as a result of the complaints, pilots were worried about flying with her. Further, because the pilots' reticence hampered communication with German, Beck contended it also impacted safety. This evidence creates a question of fact regarding whether Beck was motivated by retaliatory animus.

The record also contains evidence that suggests Beck instigated the investigation into the Toppenish flight. The flight occurred on August 13, and Beck was the first person to elevate a safety concern about that flight to Landstrom and other management, eighteen days after the flight. Beck claimed McConnell had told her about the incident. She described it as a "near miss" and stated that other pilots had also raised communication and safety concerns about German.

Beck also asked Amy Nelson and Jesse Hopson, who each had concerns about German,[11] to submit e-mails relaying safety concerns about German, even though neither of them had firsthand knowledge of the Toppenish flight, and they did so. Based on Beck's e-mail, ALNW also sought information from Air Methods

---

[11] According to Kline, Amy Nelson was upset about a pilot leaving after German made a sexual harassment complaint about him and believed the allegations were wrong. Landstrom testified that Hopson was one of the men who was concerned that German would accuse them of sexual harassment.

pilots about safety and communications concerns. McConnell, the pilot on the Toppenish flight declined, but another pilot, Leeper, did respond with a statement describing several communications and safety issues.

Landstrom testified that he took these e-mails into account when disciplining German. He also testified that he never provided these e-mails to German in the investigation or disciplinary process. Moreover, before deciding to counsel German and impose an action plan, Landstrom did not obtain information from the only other firsthand witnesses to the Toppenish event, pilot McConnell, and back seat nurse Fritts. Without prompting, after ALNW managers had already met with German to discuss the concerns raised in the e-mails, Fritts wrote an e-mail describing her version of the Toppenish flight. And at Fritts's deposition, after reviewing Beck's e-mail about the Toppenish flight, Fritts disagreed that the event was a "near miss" and stated about Beck's narrative, "This is absolutely false." Yet the decisionmakers did not consider this information in determining how to address the safety concerns.

As in Allison and Boyd, here, the person who decided that German should be counseled and transferred to fixed-wing aircraft, Landstrom and Chief Flight Nurse Nelson, relied on information sent by and procured by Beck, about whom there is evidence of retaliatory animus. Even if ALNW claims German's statement about not having "pilot eyes" was the reason for the safety concern, Landstrom's sole reliance on e-mails from people who had known concerns based on German's complaints, but lacked firsthand knowledge of the Toppenish flight, creates a question of fact as to whether retaliation was a substantial factor

25

in ALNW's decision to investigate the Toppenish incident and the resulting discipline.

Moreover, there is evidence that suggests the particular discipline that was imposed was not based solely on safety concerns. The union representative, Kline, testified that discipline usually was for breaking a policy or "behavior," that she had "never seen a flight member get a corrective action over something like this before," and agreed that it was "highly unusual" for one crew member to receive a formal counseling or action plan rather than all crew members. Kline also testified that ALNW was "very, very vague" about what the safety protocols and German's safety and communication issues were, or how the action plan would address them or what the end date was. German also described the plan as "all very, very vague" because after transferring away from Wenatchee, "she wasn't given things to work on"; instead, her new team was told she "just needed support in a more mature environment." German was made to "rid[e] third"; Fritts described flying third as being "an observer" and not something they usually would do outside of orientation. The evidence thus creates a question of fact as to whether the counseling and action plan imposed were for the purpose of furthering safety and improving communication, or were motivated by retaliation, given Beck's stated concerns about her complaints about pilots and patent desire for German to be transferred away from the Wenatchee base.

Viewing the record in the light most favorable to the nonmoving party, we conclude that the record contains evidence sufficient to create a genuine issue of material fact as to whether German's reports of sexual harassment were a

substantial factor motivating its decision to investigate her for safety concerns and temporarily transfer her to fixed-wing aircraft, which required her to be relocated away from its Wenatchee base.

We reverse the trial court's grant of summary judgment dismissing German's retaliation claim and remand for further proceedings.

_Chung, J._

WE CONCUR:

_Feldman, J._                    _Birk, J._