FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JULY 25, 2024

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JULY 25, 2024

*E. Lennon*
ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| ADELINA GABRIELA SUAREZ, <br><br> Respondent, <br><br> v. <br><br> STATE OF WASHINGTON, TAMMY WINEGAR and her community property, JULIANNE MOORE and her community property, and TAMMY MASTERS and her community property, <br><br> Petitioners. | No. 101386-8 <br><br> En Banc <br><br> Filed: <u>July 25, 2024</u> |

WHITENER, J.— On Sunday September 29, 2019, Adelina Gabriela Suarez called her employer, informing them that she simply could not see herself coming into work that day because working that day conflicted with her religious beliefs. Clerk's Papers (CP) at 142. Several days later Suarez was terminated by her employer, Yakima Valley School, a nursing facility operated by the State of Washington. CP at 166. Suarez alleged, first, that Yakima Valley failed to make reasonable accommodations for her religious practices, and second, that Yakima Valley terminated her in violation of public policy, specifically the Washington Law Against Discrimination's (WLAD) prohibition of employers terminating employees because of the employees' religion. CP at 5-6, 206; ch. 49.60 RCW. In response to those claims, the State argued that the accommodations Suarez sought would have

1

been an "undue hardship" on Yakima Valley and that her termination was not for her religious practices but for her unreliability. CP at 305, 312-13.

Like its federal counterpart, Title VII of the Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241, employers are required to make reasonable accommodations for an employee's religious practices under the WLAD. *Kumar v. Gate Gourmet, Inc.*, 180 Wn.2d 481, 501, 325 P.3d 193 (2014). A defense an employer can raise when facing the allegation that they failed to provide a reasonable accommodation is that the accommodation would cause an "undue hardship" on the conduct of the employer's business. *Id.* at 502. This case primarily concerns what constitutes an "undue hardship" on the conduct of the employer's business.

In *Kumar*, we adopted Title VII's "undue hardship" defense analysis from *Hardison*. 180 Wn.2d at 502 (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84, 97 S. Ct. 2264, 53 L. Ed. 2d 113 (1977)). In the case before us, the Court of Appeals applied a different "undue hardship" defense analysis, one from WAC 82-56-020. *Suarez v. State*, 23 Wn. App. 2d 609, 625, 517 P.3d 474 (2022). Soon after the Court of Appeals' decision, the United States Supreme Court revisited *Hardison* in *Groff v. DeJoy*, 600 U.S. 447, 143 S. Ct. 2279, 216 L. Ed. 2d 1041 (2023), and made some clarifications to Title VII's "undue hardship" defense analysis.

2

The correct analysis of an "undue hardship" defense against a claim for failure to provide reasonable accommodation for an employee's religious practices under the WLAD is within *Hardison*, adopted by this court in *Kumar*, and clarified by the United States Supreme Court in *Groff*, not WAC 82-56-020. Suarez's requested accommodation requires the violation of seniority rights under a collective bargaining agreement (CBA). Under *Hardison*, such a request is an undue hardship, and it remains so under *Groff*. We reverse the Court of Appeals' holding and affirm the superior court's order granting summary judgment.

FACTS

Suarez is an "nondenominational Christian" and regularly attends church on Tuesdays and Saturdays. CP at 118-20. Her religion includes the observation of a Saturday Sabbath and several holidays throughout the year called the Feasts of God, where observers are commanded to abstain from work. CP at 120, 247.

Yakima Valley, located in Selah, Washington, is a certified nursing facility for adults with disabilities and is administered by the Washington State Department

of Social and Health Services (DSHS).[1] CP at 54, 98, 159. Yakima Valley operates 24 hours a day, 7 days a week and must maintain certain staffing levels for each shift because of the care required for its residents. CP at 165. As a result, staff is required to do mandatory overtime. CP at 56, 165. Although there is a 12 month probationary period, Yakima Valley's employees are unionized and are governed by a CBA. CP at 56, 221. Leave is controlled by the CBA and an employee's priority for leave requests are determined by their position and their seniority. CP at 165. The shift an employee works and the days of the week an employee has off are tied to their position. CP at 319. Permanent employees can bid on other positions when they become available. CP at 165. Probationary employees can apply for other positions only if no permanent employee has bid for the position. CP at 165. Throughout the events of this case, Suarez was a probationary employee of Yakima Valley. CP at 68.

In September 2018, Suarez applied for a position as an "Attendant Counselor 1" tasked with providing care and assistance to residents of the facility. CP at 54,

---

[1] The State, in its submissions to the trial and appellate courts, and the Court of Appeals in their published decision, described Yakima Valley's residents as "disabled adults." CP at 97, 98, 108, 164, 298, 307, 348; State's Pet. for Rev. at 4-5, 21; *Suarez*, 23 Wn. App. 2d at 614. Word choice is personal but also reflects dominant attitudes, which may further oppress or empower historically excluded groups. Erin E. Andrews et al., *The Evolution of Disability Language: Choosing Terms To Describe Disability*, 15 DISABILITY & HEALTH J. no. 3 (2022), https://www.ndcpd.org/wp-content/uploads/sites/16/2023/02/Dis-Health-Journal-Choosing-Terms-to-Describe-Disability-2022.pdf [https://perma.cc/7XDZ-QF7U]. We use language that is more inclusive of people with disabilities. RCW 44.04.280. Identifying the disability rather than the person first can be condescending, offensive, and dehumanizing. "Person with disabilities," rather than "disabled person," places emphasis on the person, signaling that their identity does not revolve around a disability. *Id.*

116, 122-24. Specifically, Suarez applied for the night shift, from 10 PM to 6:30 AM, with Mondays and Tuesdays off. CP at 123-24, 159. On October 8, 2018, Suarez was hired for the position. CP at 4, 115.

During her probationary period, Suarez asked management several times for a schedule change with Saturdays off, to observe her Saturday Sabbath. CP at 124-27. Management explained to Suarez that her days off were tied to the position she was hired for and could not be changed, and that she could apply for a different position with a schedule that could be a better fit for her. CP at 319. Subsequently, a position with Saturdays off became available. An e-mail posting for the position was sent to all DSHS staff. CP at 240, 242. Suarez never applied for the position, nor did her management directly inform her of the position. CP at 242. Another probationary employee, with less seniority than Suarez, applied for and obtained the position. CP at 238-42.

The CBA allowed employees to be excused from mandatory overtime once a quarter. CP at 129. Suarez requested to be relieved of several mandatory overtime shifts; some of her requests were denied, and Suarez would refuse to work those mandatory overtime shifts in violation of the CBA. CP at 129-31. In one quarter, Suarez refused two mandatory overtime shifts on October 29 and November 9. CP at 129. Management discussed with Suarez the importance of complying with the CBA, after which Suarez twice refused mandatory overtime shifts on March 24 and

25. CP at 130. After another discussion with management, Suarez refused four shifts in the quarter of July through August. CP at 131. In general, employees refused mandatory overtime shifts "all the time," though the consequences for refusal could vary depending on the "situation" and if they were "permanent status or … probationary status" employees. CP at 221.

In addition, the CBA has a provision allowing two days of leave for reasons of faith or conscience per calendar year "in accordance with RCW 1.16.050." CP at 169. The CBA states that such leave must be requested with at least 14 days of notice to the supervisor and may be denied only if "the employee's absence would impose an undue hardship on the Employer as defined by Chapter 82-56 WAC." CP at 169.

Suarez made several leave requests for religious reasons. In April 2019, Suarez was granted a weeklong request for Passover. CP at 55, 247. On September 9, 2019, Suarez requested religious leave on September 28 and 29 as well as several days in October, but her religious leave requests were denied for staffing reasons. CP at 378. On September 21, 2019, Suarez submitted another leave request to her supervisor for the same September dates, 28 and 29, but this time as a request for leave without pay. CP at 137. Suarez was told that if she wanted to take those days off as leave without pay, she would need to speak with management higher up, as only the superintendent handles leave without pay requests. CP at 320, 378. On September 27, 2019, Suarez submitted to the superintendent her request for leave

without pay for September 28 and 29, as well as the October dates. CP at 166. Her request for September 28 and 29 were denied for being too close in time to making the request, but her October dates were granted. CP at 166, 171.

On September 29, Suarez attended a religious function in Seattle, and several hours before the start of her shift Suarez informed management that she would not come into work that day. CP at 142, 166, 173. On September 29, Yakima Valley's night shift needed 21 staff members to meet staffing requirements. CP at 233. Yakima Valley had 24 staff members assigned to work that shift, and 4 were on leave, including Suarez's "'unscheduled leave.'" CP at 233. Yakima Valley's process of obtaining coverage involves management first reaching out to an "on-call pool," then the voluntary overtime list, and if the on-call pool or voluntary overtime list do not yield coverage, then they call in an employee for a mandatory overtime shift. CP at 234-35. Suarez's absence required another employee to cover her shift under mandatory overtime. CP at 231.

On October 4, 2019, the superintendent terminated Suarez after reviewing her attendance, her refusal to work mandatory overtime, and her "not show[ing] up [on September 29] when she knew the facility would be short-staffed without her." CP at 166. At the time of her termination, Suarez was still a probationary employee and did not have all the protections of the CBA. CP at 68. Suarez believes she was terminated because of her religion due to the closeness in time of her termination to

the day she attempted to take "off for [her] religion," September 29, 2019. CP at 144-45.

Suarez filed a complaint in Yakima County Superior Court against the State of Washington and members of Yakima Valley management, alleging violations of the WLAD and wrongful termination in violation of public policy. CP at 5-6. After the completion of discovery, both Suarez and the State filed competing summary judgment motions. CP at 199, 297. The superior court denied Suarez's motion and granted the State's motion, dismissing both of Suarez's claims. CP at 402-03. The superior court held that Yakima Valley had given Suarez reasonable accommodations of her religious practices and that there was "no showing that [Suarez] was being fired because of some sort of religious discrimination." Mot. on Summ. J. Verbatim Tr. of Proc. (June 16, 2021) (TP) at 53. Suarez moved for reconsideration, which the superior court denied. CP at 406, 466.

Suarez appealed the superior court's summary judgment decision. The Court of Appeals reversed the superior court's dismissal of Suarez's two claims, holding that there were genuine issues of material fact as to whether Yakima Valley provided Suarez reasonable accommodations for her religion and whether Yakima Valley terminated her due to her religion. *Suarez*, 23 Wn. App. 2d at 613.

## STANDARD OF REVIEW

The court reviews summary judgment decisions de novo. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). Granting a summary judgment motion would be appropriate if, viewing the evidence most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party. *Johnson v. Wash. State Liquor & Cannabis Bd.*, 197 Wn.2d 605, 611, 486 P.3d 125 (2021) (quoting *Delgado-Guijosa v. Wal-Mart Stores, Inc.*, 144 Wn.2d 907, 915, 32 P.3d 250 (2001)).

## ANALYSIS

### I. *The Failure To Reasonably Accommodate an Employee's Religious Practices Claim*

Suarez claims that Yakima Valley failed to reasonably accommodate her religious practices as required by the WLAD. In response, the State submitted an "undue hardship" defense. CP at 305. The Court of Appeals analyzed the "undue hardship" defense under WAC 82-56-020. *Suarez*, 23 Wn. App. 2d at 625. Whether or not it erred is the question before this court. We start by looking at why the WLAD was created and how it created a requirement for reasonable religious accommodations and an "undue hardship" defense to overcome that requirement.

9

### A. Title VII and the WLAD

In 1945, the New York State Legislature passed what would become the first of its kind, a state law prohibiting employers from discriminating against job applicants and employees on the basis of "race, creed, color or national origin." Terry Lichtash, *Ives-Quinn Act—The Law Against Discrimination*, 19 ST. JOHN'S L. REV. 170 (1945); Haley Richardson, *Freedom's Ladder: WNYC and New York's Anti-Discrimination Law*, WNYC.ORG, Mar. 12, 2011, https://www.wnyc.org/story/117609-freedoms-ladder/ [https://perma.cc/9Q4L-JPVV]. Four years later, during its 1949 session, the Washington State Legislature passed the WLAD with the New York law as its inspiration. Frank P. Helsell, *The Law against Discrimination in Employment*, 25 WASH. L. REV. 225 (1950). With this law, the Washington State Legislature aimed to "prevent and eliminate discrimination in employment against persons because of race, creed, color or national origin," as "such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state." LAWS OF 1949, ch. 183, pmbl., § 1. Since its passage, the WLAD has been amended several times, and, with its amendments, the legislature expanded the list of protected classes and protected areas. RCW 49.60.010.

The United States Congress would later pass laws similar to the WLAD and its New York predecessor. They all had the aim of eliminating discrimination, such

as the Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act of 1990, and, most relevant for this case, Title VII of the Civil Rights Act of 1964.

Title VII, was implemented by Congress to ensure that the other civil protections contained in the Civil Rights Act would be strengthened with the prohibition of discrimination in employment.

> The right to vote, however, does not have much meaning on an empty stomach. The impetus to achieve excellence in education is lacking if gainful employment is closed to the graduate. The opportunity to enter a restaurant or hotel is a shallow victory where one's pockets are empty.

H.R. REP. 88-914, pt. 2, at 26 (1963) *reprinted in* 1964 U.S.C.C.A.N. 2391, 2513. Like its state law counterparts concerning discrimination in employment, Title VII was in response to "overwhelming" discrimination in employment, where "nonwhites" suffered from double the rate of unemployment and earned less than half as compared to white workers in 1962. *Id*. at 26-30, 1964 U.S.C.C.A.N. 2391, 2513-17. Congress's objective with the enactment of Title VII was to

> achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees. Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to "freeze" the status quo of prior discriminatory employment practices.

11

*Griggs v. Duke Power Co.*, 401 U.S. 424, 429-30, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971).

Under Title VII, like the WLAD, it would be an "unlawful employment practice for an employer … to discriminate against any individual … because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); RCW 49.60.180. This expressed negative mandate prevented the discrimination of those protected classes, but an affirmative duty would be imposed on employers shortly after Title VII was enacted with a rule promulgated by the Equal Employment Opportunity Commission (EEOC), requiring employers "to make reasonable accommodations to the religious needs of employees" unless doing so would create "undue hardship on the conduct of the employer's business." 29 C.F.R. § 1605.1 (1968). The EEOC regulation would be expressly added to Title VII by amendment in 1972. 42 U.S.C. § 2000e(j) ("[An employer must give reasonable religious accommodation] unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.").

*Hardison* is the seminal case for the analysis of an "undue hardship" defense under Title VII. *Hardison* concerned an employee who claimed his employer, Trans World Airlines (TWA), failed to reasonably accommodate his religious practices.

432 U.S. 63. Larry Hardison worked at a large maintenance base for TWA, which operated 24 hours a day, 365 days a year. *Id*. at 66-67. Hardison was unable to work from "sunset on Friday until sunset on Saturday." *Id*. Hardison worked under a CBA, and per the CBA, whenever there was an absence, an employee from another department or a supervisor covered the absence, even "if the work in other areas may suffer," because of the essential operations occurring at that maintenance base. *Id*. Despite informing TWA about his religious conflict with Saturday shifts, Hardison still received work on Saturdays as he was the only one available on the weekend to do the work required and the union was not willing to violate the seniority provisions of the CBA to accommodate Hardison's religious beliefs. *Id*. at 68. Eventually, Hardison refused to work on Saturdays, and he was discharged for insubordination. Hardison filed a Title VII claim. *Id*. at 69.

In *Hardison*, the United States Supreme Court was tasked with determining what constituted an "'undue hardship on the conduct of the employer's business'" when an employer fails to make reasonable accommodations for their employee's religious practices. *Id*. at 74 (quoting 42 U.S.C. § 2000e(j)). *Hardison*'s majority held, "To require TWA *to bear more than a de minimis cost* in order to give Hardison Saturdays off *is an undue hardship*." *Id*. at 84 (emphasis added). *Hardison* also held that accommodations that caused other functions of the employer's business to suffer, required the employer to pay overtime wages to another employee, or violated

a CBA's seniority provisions would constitute an "undue hardship." *Id.* at 76-77. For decades, federal courts applied this *Hardison* "de minimis cost" test whenever employers argued that the reasonable accommodations for their employee's religious practices would cause an "undue hardship."

Almost four decades after *Hardison*, this court, in *Kumar*, was asked if the WLAD, like Title VII, required employers to make reasonable accommodations for their employees' religious practices. 180 Wn.2d at 489. Kumar brought a suit against his employer, Gate Gourmet Inc., alleging violations of the WLAD. Kumar, and other employees, were prohibited from bringing in their own lunch to work and were provided food that contained ingredients forbidden by their religious beliefs. *Id*. at 487. Kumar argued that WLAD was as protective as its relevant federal counterpart, Title VII, and it requires employers to make reasonable accommodations for their employees' religious practices. *Id*. at 496. Gate Gourmet Inc. argued that the WLAD was less protective than Title VII, as Title VII expressly required reasonable accommodation for religious practices, but the WLAD did not. *Id.* at 492. The *Kumar* court considered Title VII's history and concluded that the WLAD implicitly required employers to reasonably accommodate an employee's religious practices. *Id*. at 496.

With *Kumar*'s holding, an employee establishes a prima facie claim of failure to accommodate religious practices under the WLAD by showing that (1) they had

14

a bona fide religious belief, the practice of which conflicted with employment duties, (2) they informed the employer of the beliefs and conflict, and (3) the employer responded by subjecting the employee to threatened or actual discriminatory treatment. *Id.* at 501. Like Title VII, under the WLAD, an employer could defend against a claim of failure to accommodate religious practices with an "undue hardship" defense by showing that the reasonable accommodation would not be possible without "'undue hardship on the conduct of the employer's business.'" *Id*. at 497 (quoting 42 U.S.C. § 2000e(j)). Borrowed from Title VII, the WLAD used the "undue hardship" analysis from *Hardison*. *Id*. at 502.

> B. *RCW 1.16.050(3) and WAC 82-56-020 – The "Significant Difficulty or Expense" Test*

Shortly after this court's decision in *Kumar*, the legislature amended RCW 1.16.050, which lists the legal holidays, and gave state employees the right to request up to two unpaid religious holidays per year. LAWS OF 2014, ch. 168, § 1. RCW 1.16.050(3) states:

> Employees of the state … are entitled to two unpaid holidays per calendar year for a reason of faith or conscience or an organized activity conducted under the auspices of a religious denomination, church, or religious organization…. The employee may select the days on which the employee desires to take the two unpaid holidays after consultation with the employer pursuant to guidelines to be promulgated by rule of the appropriate personnel authority, or in the case of local government by ordinance or resolution of the legislative authority. If an employee prefers to take the two unpaid holidays on specific days for a reason of faith or conscience, or an organized activity conducted under the

auspices of a religious denomination, church, or religious organization, the employer must allow the employee to do so unless the employee's absence would impose an undue hardship on the employer or the employee is necessary to maintain public safety. Undue hardship shall have the meaning established in rule by the office of financial management under RCW 43.41.109.

In contrast to the WLAD, which concerns religious accommodations for all employees by all employers, public or private, RCW 1.16.050(3) has a very narrow mandate that requires state employers to give their employees two days of unpaid leave per calendar year for religious purposes, unless the state employer would suffer "undue hardship" as defined by the Office of Financial Management (OFM). *Id*; LAWS OF 2014, ch. 168, §§ 1, 2; RCW 43.41.109 ("The director of the office of financial management shall by rule establish a definition of 'undue hardship' for the purposes of RCW 1.16.050."). The OFM created a 10 factor test, within WAC 82-56-020, to aid in determining whether the approval of an unpaid leave request, pursuant to RCW 1.16.050(3), results in an "undue hardship" to the employer. WAC 82-56-020 states:

> For purposes of chapter 168, Laws of 2014, "undue hardship" means an action requiring significant difficulty or expense to the employer. The following factors should be considered in determining whether approving unpaid leave results in an undue hardship to the employer:
>
> (1) The number, composition, and structure of staff employed by the employing entity or in the requesting employee's program.
>
> (2) The financial resources of the employing entity or the requesting employee's program.

16

(3) The number of employees requesting leave for each day subject to such a request.

(4) The financial impact on the employing entity or requesting employee's program resulting from the employee's absence and whether that impact is greater than a de minim[i]s cost to the employer in relation to the size of the employing entity or requesting employee's program.

(5) Impact on the employing entity, the requesting employee's program, workplace safety or public safety.

(6) Type of operations of the employing entity or requesting employee's program.

(7) Geographic location of the employee or geographic separation of the particular program to the operations of the employing entity.

(8) Nature of the employee's work.

(9) Deprivation of another employee's job preference or other benefit guaranteed by a bona fide seniority system or collective bargaining agreement.

(10) Any other impact on the employing entity's operation or requesting employee's program due to the employee's absence.

In other words, an "undue hardship" for purposes of RCW 1.16.050(3) occurs when a state employer would experience significant difficulty or expense if it were to grant an employee's request for two days of unpaid leave. When determining what constitutes a "significant difficulty or expense" to the state employer, there are 10 factors to consider, including the employer's resources, how many other employees are requesting the same day for leave, the financial impact to the employer, and whether the request leave conflicts with another employee's right or a CBA.

C.    *The Court of Appeals Applies the OFM's "Significant Difficulty or Expense" Test to the WLAD*

After considering the competing summary judgment motions from Suarez and the State, the Yakima County Superior Court granted the State's motion and dismissed Suarez's claims. The court held that Suarez was unable to establish that her termination was due to religious discrimination, in violation of public policy, and also that the accommodations she sought would cause an undue hardship to Yakima Valley. TP at 51-58. When it came to Suarez's Saturday Sabbath, the superior court focused its attention on the position itself being tied to specific days off from the outset.

> [W]hen a person is told, you know, here's what you're signing up for which is to work particular days, and you know that going into it … if it doesn't work into your very strongly held faith or belief system, then you need to either apply for a different job or, you know, find something else that accommodates that better.

TP at 53-54. When it came to Yakima Valley's denial of Suarez's requested days of leave in September, the superior court believed it would have caused an "undue hardship" for Yakima Valley.

> It was just those couple of days where the employer was otherwise extremely concerned about being able to find coverage. . . .
>
> … She did know of the requirement at the time of hiring, and the employer is required to provide a reasonable accommodation, but to provide a privilege would present itself as an unfair burden both for them and for how they treat other employees.

TP at 54-57.

18

Suarez appealed the superior court's rulings before the Court of Appeals. When the Court of Appeals considered the State's "undue hardship" defense to Suarez's WLAD claim concerning the denial of the September leave requests, it declined to use *Hardison*'s "de minimis cost" test and instead applied OFM's "significant difficulty or expense" test from WAC 82-56-020 for RCW 1.16.050(3). *Suarez*, 23 Wn. App. 2d at 625 ("While this regulatory definition [WAC 82-56-020] applies when a state employer considers a leave request for the leave provided by statute [RCW 1.16.050(3)], we see no need to use a different definition for the same leave granted beyond the two days provided in the statute."). With the "significant difficulty or expense" test, the Court of Appeals held that it was unclear whether Suarez's unpaid leave request on September 29, 2019 would have caused Yakima Valley "undue hardship."

However, when it came to Suarez's Saturday Sabbath and Yakima Valley's failure to change her days off, the Court of Appeals applied both the OFM "significant difficulty or expense" test and *Hardison*'s "de minimis cost" test, and ultimately held that the shift change caused Yakima Valley an "undue hardship."

> [U]nder WAC 82-56-020(9), undue hardship is demonstrated when a proposed accommodation would deprive another employee of their job preference or other benefits guaranteed by a collective bargaining agreement.
>
> Here, as in *Hardison*, changing scheduled days off requires changing positions, which is covered by the bidding system set forth in the

19

collective bargaining agreement. Therefore, Suarez's proposed accommodation of simply changing her scheduled days off would require the School to violate the bidding system in the collective bargaining agreement. We agree that requiring the School to accommodate Suarez's religious beliefs by violating the collective bargaining agreement would cause an undue hardship.

*Id*. at 628.

> D.      Groff *clarifies* Hardison*'s Title VII Analysis – The "Substantial Burdens" Test*

Shortly after the Court of Appeals' decision in *Suarez*, the United States Supreme Court issued a decision that revisited the *Hardison* analysis of Title VII's "undue hardship" defense, *Groff*, 600 U.S. 447. The plaintiff, Gerald Groff, was employed by the United States Postal Service and his religious beliefs conflicted with working on Sundays. *Id.* at 454. As a consequence of his employer making an agreement with Amazon to make Sunday deliveries and a recently negotiated union contract, Groff was required to work on Sundays. *Id.* at 454-55. On the Sundays Groff was scheduled to work, he did not, and his work was covered by other employees. *Id.* at 455. Groff received several disciplinary notices for failing to work Sundays until he ultimately resigned. *Id*. At the United States Supreme Court, Groff sought to overturn *Hardison*'s "de minimis cost" test with a "significant difficulty or expense" test, which the Court declined to do. *Id.* at 470. Instead, the *Groff* Court *clarified* the analysis of an "undue hardship" defense under *Hardison*. The *Groff* Court found that lower courts had misinterpreted *Hardison*, as it did not establish a

"de minimis cost" test but rather created a substantial burdens test. *Id*. at 464. The Court reasoned that lower courts had wrongfully fixated on that particular sentence within the second to last paragraph of *Hardison*'s majority opinion mentioning "de minimis cost" because 'footnote 14 of the majority opinion makes several mentions that an accommodation is not required when it entails "'substantial'" "'costs'" or "'expenditures.'" *Id*. at 464 (quoting *Hardison*, 432 U.S. at 83, n.14). Elaborating further, the *Groff* Court explained how substantial burdens, as compared with "de minimis cost," is a better fit with the *Hardison* decision holistically.

> [S]howing "more than a de minimis cost," as that phrase is used in common parlance, does not suffice to establish "undue hardship" under Title VII. *Hardison* cannot be reduced to that one phrase ["to bear more than a de minimis cost … is an undue hardship"]. In describing an employer's "undue hardship" defense, *Hardison* referred repeatedly to "substantial" burdens, and that formulation better explains the decision. We therefore, like the parties, understand *Hardison* to mean that "undue hardship" is shown when a burden is substantial in the overall context of an employer's business. This fact-specific inquiry comports with both *Hardison* and the meaning of "undue hardship" in ordinary speech.

*Id*. at 468 (citation omitted), 474 (Sotomayor, J., concurring) ("The … standard is 'undue hardship,' not trivial cost."). When applying the "substantial burdens" test to an "undue hardship" defense, a court must consider whether the defendant employer has sufficiently shown that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business. *Id*. at 469 (quoting *Hardison*, 432 U.S. at 83, n.14). That determination would be aided by looking at "all relevant factors in the case at hand, including the particular

21

accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer.'" *Id.* at 470-71 (alteration in original) (quoting court papers). One thing that was quite clear from *Hardison*, and remained so with *Groff*, was that to contravene seniority rights for a religious accommodation would be "off-limits." *Id*. at 465.

       E.      *The Court of Appeals Erred When It Applied the "Significant Difficulty or Expense" Test to Suarez's WLAD Claims.*

Suarez's claims were brought under the WLAD. CP at 5-6, 204-8. Yakima Valley pursued an "undue hardship" defense in response to Suarez's claim that Yakima Valley failed to provide her a reasonable accommodation for her religious practices, as required under the WLAD. The Court of Appeals, for the sake of simplicity and to avoid having to do two separate analyses under two separate tests, used the OFM's "significant difficulty or expense" test from WAC 82-56-020 for days it believed were beyond the narrow ambit of RCW 1.16.050(3). *Suarez*, 23 Wn. App. 2d at 624. The Court of Appeals' noble attempt conflicts with both RCW 1.16.050(3) and *Kumar.* It incorrectly expands the OFM's "significant difficulty or expense" test beyond the narrow ambit of RCW 1.16.050(3) and into the WLAD. In *Kumar*, we held that the WLAD, like Title VII, required employers to provide reasonable accommodations of employees' religious practices unless the accommodation created an "undue hardship" as elaborated in *Hardison*. *Kumar*, 180 Wn.2d at 500-02. The use of *Hardison* has not been overturned or changed by the

22

legislature when considering "undue hardship" defenses under the WLAD. In fact, the legislature expressly limited the OFM's "undue hardship" analysis within WAC 82-56-020 to leave taken under RCW 1.16.050(3). RCW 1.16.050(3) ("Undue hardship shall have the meaning established in rule by the office of financial management under RCW 43.41.109."); RCW 43.41.109 ("The director of the office of financial management shall by rule establish a definition of 'undue hardship' *for the purposes of RCW 1.16.050*." (emphasis added)). Suarez's claim was made under the WLAD, not RCW 1.16.050(3), and *Hardison* must be applied when considering an "undue hardship" defense under the WLAD.

But which *Hardison* test? When *Hardison* was adopted by this court in *Kumar*, *Hardison*'s analysis of an "undue hardship" defense was commonly understood to be the "de minimis cost" test. *Kumar*, 180 Wn.2d at 502 (quoting *Hardison*, 432 U.S. at 84). *Groff* later clarified *Hardison*, making the analysis of an "undue hardship" defense against a Title VII claim a substantial burdens test. *Groff*, 600 U.S. at 464. For the following reasons, we now hold that a court considering an "undue hardship" defense in response to a failure to reasonably accommodate an employee's religious practices under the WLAD must apply the substantial burdens test. *Id.* at 469.

First and most importantly, the WLAD's purpose is the "elimination and prevention of discrimination," and it contains a requirement that the WLAD be

construed "liberally for the accomplishment" of this purpose. RCW 49.60.010, .020. To hold otherwise is contradictory to the purpose of the WLAD and the plain meaning of "undue hardship," as "de minimis" is something that is "'very small or trifling.'" *Groff*, 600 U.S. at 469 (quoting BLACK'S LAW DICTIONARY 388 (5th ed. 1979)). If the requirement for a reasonable religious accommodation can be overcome by showing that an employer may have to incur nominal costs, then the WLAD's requirement for reasonable religious accommodation is somewhat hollow and is interpreted narrowly and not liberally in violation of RCW 49.60.020. By contrast, the substantial burdens test better advances the WLAD's purpose, is consistent with the requirement to liberally construe the WLAD, and does not contradict the plain meaning of "undue hardship." A "hardship" is, at a minimum, "'something hard to bear,'" and adding the modifier "undue" means that the requisite burden, privation, or adversity must rise to an "'excessive'" or "'unjustifiable'" level. *Id.* at 468-69 (quoting RANDOM HOUSE DICTIONARY 646, 1547 (1966)).

Second, though not binding, we have looked to federal counterpart statutes and their case law when interpreting provisions in the WLAD. It is instructive that the WLAD carries Title VII's requirement for reasonable accommodation of an employee's religious practices and the "undue hardship" defense analysis from *Hardison*. *Kumar*, 180 Wn.2d at 490-98.

24

*Suarez v. State*, No. 101386-8

Third, when this court has departed from federal antidiscrimination laws, it has almost always ruled that the WLAD provides greater protections than its federal counterparts. *Kumar*, 180 Wn.2d at 491. Failing to adopt the more protective substantial burdens test would create an unusual situation where the WLAD is less protective against discrimination than Title VII.

Suarez's claims were made under the WLAD, not RCW 1.16.050(3). Title VII's "undue hardship" defense analysis from *Hardison* must be applied when considering an "undue hardship" defense under the WLAD. When considering an "undue hardship" analysis, a court must consider whether the defendant employer has sufficiently shown that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business. *Groff*, 600 U.S. at 469 (quoting *Hardison*, 432 U.S. at 83, n.14). The court should look at all relevant factors in the case at hand, "including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer.'" *Id*. at 470-71 (alteration in original) (quoting court papers). It would not be enough to simply conclude that a suggested accommodation would cause an undue hardship, an employer would have to consider other possible options. *Id.* at 473. Courts should resolve whether a hardship would be substantial in the context of an employer's business in the commonsense manner that it would use in applying any such test. *Id*. at 471.

Additionally, the analysis of an "undue hardship" defense is not simply a financial or monetary loss calculation. An accommodation that required the violation of governmental mandate would cause an employer an "undue hardship." *D'Cunha v. Northwell Health Sys.*, 2023 WL 7986441, at *3 (2d Cir. Nov. 17, 2023) (court order). An accommodation that creates unreasonable safety risks, regardless of economic costs, also presents an "undue hardship" for an employer. *Smith v. City of Atlantic City*, 2023 WL 8253025, at *8 (D.N.J. Nov. 28, 2023) (court order). An accommodation that creates an "undue hardship" on coworkers also presents an "undue hardship" for an employer. *Groff*, 600 U.S. at 475 (Sotomayor, J., concurring) ("Because the 'conduct of [a] business' plainly includes the management and performance of the business's employees, undue hardship on the conduct of a business may include undue hardship on the business's employees.").

An accommodation requiring preferential treatment on the basis of religion to the detriment of other protected classes is unsurprisingly an undue hardship, as it violates state law: the WLAD itself. In seeking to establish a hierarchy of protected classes within the WLAD, Suarez points to a footnote in the *Groff* opinion, stating that federal statutory law "'does not demand mere neutrality with regard to religious practices' but instead 'gives them favored treatment.'" 600 U.S. at 461 n.9 (quoting *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775, 135 S. Ct. 2028, 192 L. Ed. 2d 35 (2015)). Whether Suarez correctly interprets *Groff* is immaterial, as our

26

adoption of case law interpreting the WLAD's federal counterparts is limited to "'those theories and rationale which best further the purposes and mandates of our statute.'" *Kumar*, 180 Wn.2d at 491 (quoting *Grimwood v. Univ. of Puget Sound*, 110 Wn.2d 355, 361-62, 753 P.2d 517 (1988)). Therefore, when the WLAD's language "differs from that of Title VII," we have a duty to independently interpret the language of our state statute. *Marquis v. City of Spokane*, 130 Wn.2d 97, 110, 922 P.2d 43 (1996). The hierarchy of protected classes that Suarez suggests we adopt directly contradicts the central purpose of the WLAD, the elimination and prevention of discrimination on the basis of all protected classes, and the plain language of its prohibition of discrimination in the "terms or conditions of employment because of … creed." RCW 49.60.010, .180(3). Such preferential treatment is neither required *nor permitted* by the WLAD.[2] *Hardison* was clear that an employer would suffer "undue hardship" if the accommodation "transgress[ed] seniority rules," required "premium overtime pay" to another employee, or caused other functions of the employer's business to suffer. *Hardison*, 432 U.S. at 76-77. That remains so under a substantial burdens test. *Groff*, 600 U.S. at 465.

---

[2] Suarez's argument for preferential treatment also raises serious concerns about discrimination on the basis of other protected classes, such as "sex" and "sexual orientation." RCW 49.60.180. There is no requirement for a reasonable accommodation of one's animus or harassment toward a protected class under the WLAD. Obviously, such an accommodation would also contradict the WLAD's purpose to eliminate and prevent discrimination. RCW 49.60.010; Nor is animus toward a protected class to be accommodated under Title VII. *Groff*, 600 U.S. at 476 (Sotomayor, J., concurring).

For several reasons, Suarez requests accommodations for her religious practices that would force Yakima Valley to suffer an undue hardship in the conduct of its business. First, the swap of positions and days off would require Yakima Valley to violate seniority rights under the CBA. *Hardison*, 432 U.S. at 76-77; *Groff*, 600 U.S. at 465. Second, her request that Yakima Valley personally guide her through the process of applying for a different position with her preferred weekly schedule, despite receiving an e-mail containing a posting for such a position, would require Yakima Valley to violate a state mandate, the WLAD itself. Suarez does not allege that her religious beliefs or practices interfered with her ability to use e-mail or apply for the position with a better fit. Therefore, personally guiding Suarez through the application process would not accommodate her religious *beliefs or practices*. Instead, such guidance would give Suarez an advantage in the hiring process based on her religious *motivation* for applying. Giving an advantage to one applicant based on their religious beliefs violates the WLAD's express language prohibiting discrimination in hiring "because of … creed." RCW 49.60.180(1). Third, the record clearly establishes that the State did all it could to accommodate Suarez's repeated requests for time off and terminated her only after she refused, at almost the last minute, to work a scheduled shift. Even taken in the light most favorable to Suarez, the record establishes that one of her coworkers was forced, last minute, to work that shift. These amounted to undue hardships. Accordingly, we

28

reverse the appellate court's holding and affirm the superior court's summary judgment order dismissing Suarez's claim of failure to reasonably accommodate her religious beliefs.

## II.     *The Wrongful Termination in Violation of Public Policy Claim*

Suarez alleged that she was wrongfully terminated in violation of public policy by her employer. CP at 6. Specifically, she alleges she was fired for "exercising a legal right or privilege." CP at 207. Suarez cites to two provisions within the WLAD. The first is RCW 49.60.030(1), making it a civil right to be free from religious discrimination, and the second is RCW 49.60.180(2), making it an unfair practice to discharge any person from employment because of their creed. CP at 207. This places Suarez's claim within one of the four scenarios listed in *Dicomes v. State*, 113 Wn.2d 612, 618, 782 P.2d 1002 (1989).

The tort for wrongful termination in violation of public policy is a narrow exception to the at-will doctrine. *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232, 685 P.2d 1081 (1984). It generally applies in four specific scenarios: (1) where employees are fired for refusing to commit an illegal act, (2) where employees are fired for performing a public duty or obligation, (3) where employees are fired for exercising a legal right or privilege, and (4) where employees are fired in retaliation for reporting employer misconduct. *Dicomes*, 113 Wn.2d at 618. If the claim fits

neatly within one of these scenarios, in order to prevail on the cause of action, the plaintiff employee must demonstrate that their termination may have been motivated by reasons that contravene a clear mandate of public policy. *Martin v. Gonzaga Univ.*, 191 Wn.2d 712, 723, 425 P.3d 837 (2018). [3] This requires two steps. First, the "public policy" was manifested in the constitution, statute, regulatory provision, or court decision. *Id.* at 725. Second, the conduct associated with the public policy was a "significant factor" in the decision to terminate the worker. *Id.* If the employee successfully establishes these two steps, then the burden shifts to the employer to prove that the dismissal was for reasons other than those alleged by the employee. *Id.* at 726-27.

Suarez, the State, and the Court of Appeals merged the wrongful termination claim with the failure to provide reasonable accommodation claim. Suarez, in her motion for summary judgment, wrote:

> The right to be free from discrimination because of creed is a civil right. RCW 49.60.030(1). The Legislature has clearly and unambiguously declared that practices of discrimination against any of its inhabitants because of creed "threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state." RCW 49.60.010. And it is an unfair practice

---

[3] If the claim does not fit neatly with the four specific scenarios, then the Perritt framework would be applied to the claim. *Martin*, 191 Wn.2d at 724; *see Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 941, 913 P.2d 377 (1996) (explaining law professor Henry H. Perritt Jr.'s comprehensive test for analyzing wrongful discharge claims). That would require the employee to show "(1) the existence of a 'clear public policy' (clarity element), (2) whether 'discouraging the conduct in which [the employee] engaged would jeopardize the public policy' (jeopardy element), (3) whether the 'public-policy-linked conduct caused the dismissal' (causation element), and (4) whether the employer is 'able to offer an overriding justification for the dismissal' (absence of justification element)." *Rose v. Anderson Hay & Grain Co.*, 184 Wn.2d 268, 277, 358 P.3d 1139 (2015) (quoting *Gardner*, 128 Wn.2d at 941).

to discharge any person from employment because of their creed. RCW 49.60.180(2).

> … When [Yakima Valley] denied Suarez's request not to work on September 28 and 29, it forced her to choose between obeying God and obeying the State. The State not only failed to accommodate her religious practice, but it attempted to force her to do something in direct violation of her religious beliefs.

CP at 207-08. The State, in its motion for summary judgment, wrote:

> [Suarez] alleges wrongful termination in violation of public policy. However, because the second claim likely relies on the Law Against Discrimination as the public policy that was purportedly violated, these claims merge.

CP at 103. In its decision, the Court of Appeals held:

> We do not read Suarez's public policy argument as claiming an absolute right not to work on her religious holidays. Under the public policy identified within the WLAD, Suarez has the right to practice her religious beliefs free from discrimination. If her work schedule conflicts with her religious practices, she has a right to reasonable accommodations so long as the accommodations do not create an undue hardship.

*Suarez*, 23 Wn. App. 2d at 633-35.

It is true that there is significant overlap between Suarez's claims, but the analysis for each are not the same. In a failure to provide reasonable accommodation for religious practices claim, one alleges that the employer failed to perform an affirmative duty, specifically a reasonable accommodation. In a wrongful termination in violation of public policy claim, specifically under RCW 49.60.180(2) and RCW 49.60.030(1), one is alleging that the employer violated a

prohibition of a specific act, a negative mandate on employers forbidding them from terminating an employee based on their religious beliefs. The Court of Appeals erred when it merged the two in its analysis; a separate analysis is required for Suarez's wrongful termination claim with RCW 49.60.180(2) and RCW 49.60.030(1) as the public policy. The appeals court also erred when it reversed the superior court's dismissal of her claim of wrongful termination in violation of public policy claim. *Id.* at 635. Here, Suarez "did not argue that her termination was a direct statutory violation. Nor did she raise any argument or facts on her retaliation claims." *Id.* at 619. Accordingly, we reverse the Court of Appeals' holding and affirm the superior court's summary judgment order dismissing Suarez's wrongful termination in violation of public policy claim.[4]

## CONCLUSION

We reverse the Court of Appeals' holding and affirm the superior court's summary judgment order dismissing all of Suarez's claims.

---

[4] Suarez's motion for attorney fees under RCW 49.48.030 is denied.

Whitener, J.

WE CONCUR.

Stephens, J.

Johnson, J.

Gordon McCloud, J.

Madsen, J.

Yu, J.

Owens, J.

Montoya-Lewis, J.

No. 101386-8

GONZÁLEZ, C.J. (concurring) — I largely concur with the majority opinion. I agree that we should adopt the standard for undue burden articulated in *Groff v. DeJoy*, 600 U.S. 447, 468, 143 S. Ct. 2279, 216 L. Ed. 2d 1041 (2023). Under that standard, an employer must accommodate an employee's religions practice unless that accommodation would impose a substantial burden in the overall context of an employer's business.

I agree that as a matter of fact, the violation of the seniority rights in a collective bargaining agreement will almost always amount to such a substantial burden. I also agree that under the facts before us, violation of seniority rights here would have been a substantial burden.

I write separately, however, because whether assisting an employee with applying for a different shift is a reasonable accommodation is a question of fact I would leave to a jury. I respectfully disagree with the majority that such assistance would violate RCW 49.60.180(1) of the Washington Law Against Discrimination. This provision prohibits discrimination. It does not prohibit accommodations.

1

Finally, I am concerned with the majority's analysis of Suarez's wrongful discharge in violation of public policy claim. Such a claim has four elements:

> (1) the existence of a "clear public policy" (clarity element), (2) whether "discouraging the conduct in which [the employee] engaged would jeopardize the public policy" (jeopardy element), (3) whether the "public-policy-linked conduct caused the dismissal" (causation element), and (4) whether the employer is "able to offer an overriding justification for the dismissal" (absence of justification element).

*Rose v. Anderson Hay & Grain Co.*, 184 Wn.2d 268, 277, 358 P.3d 1139 (2015) (alteration in original) (quoting *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 941, 913 P.2d 377 (1996)). Suarez has made a prima facie case as to the first three elements. But I join the majority in result because the State has offered an overriding justification for the dismissal—the substantial burden accommodating violating seniority rights would impose.

With these observations, I respectfully concur.

González, C.J.

_____
Gonzalez, C.J.

2